**Leslie M. DERSTEIN, Plaintiff,**

v.

**Page BENSON, J. Patrick Brazil, and John Jaworsky, Defendants.**

No. 84–1219–K.

United States District Court, District of Kansas.

May 22, 1989.

Brian G. Grace, Wichita, Kan., for plaintiff.

Carl Gallagher, Asst. Atty. Gen., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Plaintiff Leslie R. Derstein brought this action pursuant to 42 U.S.C. § 1983, claiming that the circumstances of his termination from his position as a state court services officer violated his right to due process. In particular, plaintiff claims that the three state district court judges who are the defendants in this action—Judges Page Benson, Patrick Brazil and John Jaworsky—terminated him without warning due to allegations of sexual harassment.

Plaintiff alleges that he had a property interest in his continued employment entitling him to a pretermination hearing consisting of notice and opportunity to respond to the charges against him; that the circumstances of his termination deprived him of his "good name and reputation," thereby implicating his liberty interest and entitling him to a "name-clearing hearing"; that he did not receive a pretermination or name-clearing hearing, and if he had received such a hearing, he would not have been discharged. Finally, Derstein alleges he suffered damages in excess of $200,000.00 as a result of this denial of due process and his unjustified termination.

This case was tried to the court November 8–11, 1988, at which time the court took the matter under advisement. Both sides subsequently filed proposed findings of fact and conclusions of law, and the parties were given the opportunity to make final oral argument on February 2, 1989. After reviewing the trial transcript and exhibits, as well as the extensive proposed findings submitted by the parties, the court is now prepared to rule.

### Findings of Fact

Plaintiff Leslie Derstein began his employment with the Butler County District Court in December of 1971 as a juvenile probation officer. In October, 1973, Derstein was appointed Director of Butler County Court Services. In this position he exercised supervisory responsibilities over juvenile and misdemeanor probation officers as well as handling his own case load of juvenile offenders.

During his employment with court services, Derstein studied for and received a Masters Degree in Administration of Justice, with an emphasis in corrections. Be-

ginning in 1974 and until his termination, Derstein taught first and second level criminal justice classes at Butler County Junior College.

Plaintiff remained in his position as director of Butler County's court services until state-wide court unification. At that time, court services officers became employees of the state. Derstein received notice on February 28, 1979 that his position was to be reclassified as a Court Services Officer II ("CSO–II"), a primarily supervisory position. As a CSO–II, plaintiff supervised juvenile, adult misdemeanor and adult felony probation officers. Within the Thirteenth Judicial District, Derstein was given the title of Assistant Director of Court Services for the District. In this position, plaintiff reported to Court Services Director Mike Schill and ultimately, to Judge Benson, the administrative judge for the district.

Following court unification, four court services officers ("CSO–I") were employed by the Thirteenth Judicial District. They were Sharon Neria, Kelly Monaghan, Mark Frey and Mary Van Scyoc. Kelly Monaghan was subsequently replaced by Neil Harrison. Mary Wolfe was the secretary of the court services office.

As a state employee, the terms of plaintiff's employment were governed by the Kansas Court Personnel Handbook. According to the handbook, a tenured employee could not be summarily discharged except in the case of a "serious or grievous" offense. (Pl.Ex. 14, p. 21.) The parties agree that Derstein was considered a "tenured" employee and the disciplinary provisions of the handbook were applicable to him.

At some point after court unification, conflicts developed among staff members. In particular, disagreements arose between Derstein and adult probation officer Sharon Neria concerning office practices and procedures. For instance, Derstein proposed the creation of a central filing system, which Neria strongly opposed. Neria also objected to the juvenile probation officers' practice of taking Friday afternoons off from work. Likewise, Derstein and Mark

Frey objected to Neria's alleged practice of speaking to a client and then later laughing about the client's problems. Derstein and Frey went to Judge Benson to discuss these problems on several occasions, as did Sharon Neria.

In an evaluation dated July, 1980, Derstein received an overall rating of "very good" and was rated in the high range in most individual categories. In the category entitled "working relationships," however, Derstein was given an average rating and it was noted on his evaluation that "[Derstein] has been involved in friction producing situations with female members of staff. Usually related to supervising and giving directions to others. Direct and candid approach is taken as personal attacks on competencies and capabilities." (Pl.Ex. 39, pp. 46–50.) The evaluation further noted improvement in the area of personnel motivation and communication with staff but suggested Derstein could benefit from behavior seminars regarding staff motivation and supervision.

In the fall of 1980, Judge Benson responded to the conflicts which had developed in the court services office by ordering that the two adult probation officers, Sharon Neria and Neil Harrison, report directly to him rather than to Director Schill or Derstein. Derstein continued to exercise intermediate authority over juvenile probation officer Mark Frey.

Judge Benson's attempt to resolve the office conflicts was unsuccessful, as the interoffice disputes continued and complaints were routinely brought to Judge Benson, particularly by Derstein and Neria. Mike Schill eventually resigned and Steve Seyb was appointed as "court administrator" for the Thirteenth Judicial District. As court administrator, Seyb was in charge of "the general operations of the district court" and thus had complete supervisory authority over the court services office. (Tr., p. 449.) Judge Benson initially advised Seyb that he was to act as a "buffer" between Judge Benson and the court services officers. (Tr., p. 455.) Seyb thus

informed all court services personnel that in the future they should bring their problems to him.

Seyb testified that after he became court administrator, his most frequent "visitors" were Sharon Neria and Les Derstein, and his conversations with the two of them became very repetitive regarding their concerns. In fact, Seyb viewed their separate visits as "tattletale" sessions because "[o]nce one found the other one had been up there, wasn't too much longer until the other one would be there." (Tr., p. 454.)

In April of 1981, Seyb determined that he could not individually supervise the court services employees and still accomplish his other job responsibilities, including supervising the activities of the clerk's office and the other three courts in the district. Therefore, Seyb recommended to Judge Benson that since Derstein was the highest ranking CSO in the office, that he again be made supervisor in charge of all court services officers. Judge Benson agreed, and Derstein was reinstated as supervisor on a "probationary" basis—e.g., at the end of 60 days, Seyb and Benson planned to review Derstein's progress. Seyb testified that if Derstein's supervisory position had not worked out, Seyb's options would have been to either extend the probationary period or demote Derstein to a CSO–I position. (Tr., p. 458.)

Seyb recalls that when the CSO staff was informed that Derstein would again be their supervisor, both Sharon Neria and the secretary, Mary Wolfe, reacted negatively. Neria merely voiced her displeasure with the action while Mary Wolfe advised Seyb she was going to quit because she did not want to work for Derstein. Wolfe subsequently did quit. (Tr., pp. 459–60.)

Derstein commenced his supervisory responsibilities on approximately April 15, 1981. Shortly thereafter, Seyb was advised that Sharon Neria intended to contact an attorney about bringing a sexual harassment suit against the state because

of Derstein's alleged sexual harassment of Neria.[1] Seyb decided that the best way to handle this "rumor" was to contact the Office of Judicial Administration in Topeka and seek their assistance in conducting an investigation.

Seyb thus contacted Marjorie Van Buren, personnel officer for the judicial administrator's office. Prior to conducting the investigation requested by Seyb, Van Buren had conducted one other investigation of sexual harassment in the court system. She was also familiar with the EEOC guidelines on sexual harassment.

After Seyb informed Van Buren of the rumor regarding Neria's intent to file a sexual harassment suit and of the need for an investigation, Van Buren sent Seyb some "materials" on sexual harassment. Specifically, Seyb received from Van Buren an article on sexual harassment from an issue of "Redbook" magazine and two pages copied from a Commerce Clearing House publication on sexual harassment. These materials were subsequently placed in the "Derstein investigation file." (Tr., p. 480.)

Van Buren made two trips to El Dorado to investigate the allegations of sexual harassment. During her first visit on April 22–23, 1981, Van Buren interviewed Sharon Neria and from Neria received the names of several other persons to talk with, including Neil Harrison. In addition to Neria and Harrison, Van Buren talked to Kelly Monaghan, Mary Van Scyoc, Mary Wolfe, and Nancy Brush, a courthouse employee. Van Buren made no attempt to interview Derstein, Mark Frey or Derstein's former supervisor, Mike Schill, during these initial or subsequent interviews.

On her second trip to El Dorado on April 29, 1981, Van Buren tape-recorded interviews with some of the individuals she had spoken with on her first trip. While the interviews were not conducted under oath, the taped interviews were transcribed and copies of the transcribed interviews were

---

1. Seyb testified that he could not recall who

advised him that Neria was considering bring-

introduced at trial.[2]

The various individuals interviewed related a number of complaints to Van Buren. Kelley Monaghan stated that Derstein got along well with male employees in the court services office, but not with female employees. She stated that Derstein would put his arm around the women in the office or try to tickle them and sometimes he would pop their bra straps or make paper wads and try to throw them down their blouses. Monaghan also stated that Derstein would sometimes make offensive remarks to her about her attire, which made Monaghan feel uncomfortable. (Def.Ex. N.)

Neil Harrison related to Van Buren that while he could not recall "anything of major significance on sexual harassment," he did recall Derstein commenting to him in front of a female social worker that Mary Wolfe, the office secretary, had a "fine ass." (Def.Ex. M.)

Nancy Brush told Van Buren that Derstein had "a habit of wanting to touch" but never made any "bad comments" to her. Brush stated that "once or twice I asked him [Derstein] not to put his hands on me ... and then he would just kind of laugh like he took it as a joke." (Def.Ex. O.)

Van Buren questioned Mary Wolfe regarding why she was leaving her job as secretary and Wolfe responded that she could no longer work for "a man [Derstein] that I don't have any respect for, someone who makes me feel uncomfortable, expects things like coming in on time when he can't do it himself." Wolfe recalled that on one occasion when she had returned to the office from an errand and commented on the cold weather Derstein told her, " '[i]t's not cold outside, you're just frigid.' " Wolfe also stated that Derstein made her feel uncomfortable and self conscious about how she dressed, and because of this uneasiness she quit wearing sweaters to the office. (Def.Ex. K.)

ing a sexual harassment suit. (Tr., p. 460.)

**2.** While the court recognized that the transcribed interviews were hearsay if offered to

Sharon Neria told Van Buren that Derstein had made "some sexual comments" to her in the past. She related one particular incident which occurred when court services staff members had just finished putting a new file cabinet together and an attorney walked in and asked what they were doing. Derstein responded " 'Oh, I was just screwing Sharon.' " Neria also discussed with Van Buren numerous other difficulties she had with Derstein's office practices, which, for the most part, did not relate to her claims of sexual harassment. (Def.Ex. L.)

On May 6, 1981, Van Buren met with Steve Seyb, Judge Benson, Judge Brazil and Judge Jaworsky, and provided them with transcripts of the taped interviews. At the meeting, Van Buren stated her conclusion that Derstein's conduct, as described by the individuals she interviewed, constituted sexual harassment. Van Buren further stated her opinion that under the Kansas Court Personnel Rules, "sexual harassment" constituted a "serious and grievous offense" for which Derstein could be immediately terminated.

After lengthy discussion, the decision was made to terminate Derstein's employment under the provision of the personnel rules justifying immediate termination based upon commission of a "serious and grievous offense."

That section provides:

An employee may be discharged immediately in a case in which a serious or grievous offense has occurred....

Just causes for immediate discharge are:

1. The employee has been convicted of a crime involving moral turpitude.

2. The employee has willfully, wantonly, unreasonably, unnecessarily, or through culpable negligence been guilty of brutality or cruelty to a resident of an institution, to a person in custody, or to other persons, provided the act was not necessarily or lawfully done in self-defense, to protect the lives of others, or to

prove the truth of the matter asserted, the court admitted them in order to be apprised as to the content of each witness' complaint.

prevent the escape of a person lawfully in custody.

3. The employee has been intoxicated or under the influence of illegal drugs while on duty.

4. The employee has taken for his or her personal use from any person any fee, gift, service, or other valuable thing in the course of his or her work or in connection with it when such person is in expectation of receiving a favor or better treatment than that accorded other persons.

5. The employee has diverted or converted money or property belonging to or in the custody of the court.

An employee may be suspended without pay pending investigation of an allegation of a serious or grievous offense. (Pl.Ex. 14, p. 25.)

After the decision was made to terminate Derstein, Seyb wrote Derstein a memo, dated May 6, 1981, which stated: "The Judge has requested that you and I meet with him, in chambers tomorrow, 5–7–81 at 8:30 a.m. See you then." (Pl.Ex. 39, p. 14.) The memo did not state who would attend the meeting or its purpose. Derstein testified at trial that he believed that the meeting was to be between Seyb, Judge Benson and himself and had been called in response to an earlier request made by Derstein for a meeting between Seyb, Judge Benson and Derstein. Seyb's testimony confirmed that Derstein had requested a meeting with Seyb and Benson to discuss his new role as supervisor. Seyb testified, however, that it never occurred to him that Derstein would think that the May 7th, 1981 meeting with Judge Benson was to be the meeting Derstein requested.

When Derstein arrived at the scheduled meeting in Judge Benson's chambers, he found Benson, Judge Brazil, Judge Jaworsky and Steve Seyb already present. Judge Benson began the meeting by reviewing the history of the court services office and various internal problems in the office. He noted that two or three years before, the county commissioners had recommended that Derstein be terminated, but Judge Benson had decided not to do so.

Judge Benson informed Derstein that a court services employee had threatened to seek counsel and bring a sexual harassment suit against the state, and as a result, an investigation had been conducted which revealed that Derstein had been involved in verbal and physical sexual harassment over a period of years. Judge Benson then informed Derstein that he had ten days in which to resign or be terminated.

Derstein asked who had made this claim against him and what Judge Benson meant by "sexual" or "verbal" harassment. Judge Benson told him only that Sharon Neria had made the claim. Seyb responded that Derstein had been involved in "unprofessional behavior." Derstein then asked Seyb, "What do you mean, unprofessional behavior?" (Tr., p. 128.)

When Derstein's questions were met with silence, Derstein spoke briefly about the education he had obtained, how he sincerely cared about the court services office, and about the problems he had experienced in the office. He then told the judges that "there was something fishy going on" and that he "evidently had been framed." He concluded by telling the judges that they had been getting a lot of lies, and "if that is what it takes to get something, then I guess I will have to start lying." (Tr., p. 129.) Judge Brazil advised Derstein that he would have ten days to appeal the termination decision and would be given a hearing at that time. (Tr., p. 131.) Judge Benson then asked if there was anything else Derstein wanted to say and Derstein replied "no."

The entire meeting lasted approximately 15 minutes. In his testimony at trial, Seyb confirmed that when the decision was made to terminate Derstein and to call him in to Judge Benson's office to inform him of that decision, no one intended or planned to get Derstein's side of the story. Moreover, in his trial testimony Seyb also confirmed his previous deposition testimony that "there wasn't anything that went on on May 7th in the judge's chambers that amounted to a hearing." (Tr., p. 508.) Judge Brazil recalled at trial that Derstein asked a number of questions at the meeting and that no

response was given to several of those questions. (Tr., p. 603.)

After the meeting, Derstein returned to work. Initially, he went to Mark Frey's office to talk with him about what had happened. He then returned to his office where he spent some time "getting [himself] together" and "figuring out if this [the termination] was real or not." (Tr., p. 133.) Derstein still wanted to know what the allegations were against him, so later that same morning, he attempted to obtain a copy of Van Buren's investigation transcript. He asked Judge Benson for a copy and was told by Judge Benson that he did not have a copy and that Derstein should talk with Seyb. Seyb also claimed he did not have a copy and referred Derstein to Van Buren. Consequently, Derstein contacted Van Buren, who informed him that Judge Benson did have a copy of the transcript and that it was all right for Benson to give it to Derstein. Derstein again approached Judge Benson, who repeated his claim that he didn't have a copy of the transcript. (Tr., pp. 133–34.)

Later that same day, Derstein contacted attorney Gene White and retained White to represent him. During this initial meeting, Derstein advised White that he had never sexually harassed any of the women in the courthouse. Also during this meeting, White and Derstein reviewed the Kansas Court Personnel Handbook and White concluded that even if Derstein was guilty of sexual harassment, it could not be considered a "serious and grievous" offense. White subsequently spoke with Judge Benson and told Benson that "you may be able to fire Les [Derstein] for several reasons but you can't fire him for this reason, and you're doing it the wrong way." (Tr., p. 284.) White did not attempt, however, to obtain a copy of the investigation transcripts from Benson because "he [Benson] was going to follow a course of conduct that he had decided was appropriate, and I felt my role at that time was just to wait and see what he did and then to take appro-

priate steps on [Derstein's] behalf in response to that." (Tr., p. 285.)

Derstein did not take up the judges' offer that he "resign," rather than be terminated, but instead remained at his job until May 17, 1981. On that date, Judge Benson personally delivered Derstein's termination letter, effective the same day. The letter stated that Derstein's discharge was the result of information "made available" which indicated "an identifiable pattern of sexual harassment of female employees of the Unified Court System over an extended period, which constitutes a grievous offense." (Pl.Ex. 39, p. 11.) The letter further informed Derstein that "[t]he statements of a number of persons allege you have constantly made physical and verbal jestures [sic] restricted to female co-workers and employees" and that such behavior is "totally unacceptable." *Id.* Finally, the letter advised Derstein of his right to appeal the decision within ten days of the date of termination.

On May 18, 1981, Gene White filed an appeal letter on behalf of Derstein to the Judicial Administrator's Office. The letter stated in relevant part:

> The basis for the appeal is that in the 9 1/2 years Mr. Derstein worked for the court services he has *never* received either an oral or written reprimand for "sexual harassment."

> That the enumerated "just causes for immediate discharge" are inclusive in nature and the "sexual harassment over an extended period" is not one of the enumerated just causes.

(Pl.Ex. 39, p. 9) (emphasis in original).

Judges Benson, Brazil and Jaworsky responded to Derstein's appeal letter by filing their own letter with the appeal board.[3] The letter, dated May 26, 1981, discusses none of the specifics of the sexual harassment allegations but instead recounts past internal office disputes, unrelated to the charges of sexual harassment. (See discussion, *infra,* at p. 499.)

On June 25, 1981, the appeal board, in a 2–1 decision, found Derstein's appeal to be

---

**3.** The appeal board consisted of a judge (Herbert Walton), a supervisory employee (Kay Falley), and a nonsupervisory employee (Jess Danner).

"frivolous" because Derstein only raised the legal issue of whether sexual harassment was a serious and grievous offense. Because the board found that Derstein had not challenged the factual allegations of sexual harassment, it determined no hearing was justified. Derstein subsequently filed a motion requesting that the appeal board set aside its order finding the appeal frivolous and grant him a full hearing on the merits. In the motion, Derstein stated that his appeal letter was intended to generally initiate the appeal process, and that he was unable to go beyond generalities in his appeal letter because he had been denied access to the factual basis for his charge. The appeal board also denied this motion.

While the decision of the appeal board was appealable to the state district court pursuant to K.S.A. 60–210(d), plaintiff did not appeal the decision but instead chose to pursue a remedy in this court pursuant to 42 U.S.C. § 1983.

Derstein testified that he was unable to obtain employment for approximately four months following his termination. During that time period he applied for numerous jobs and had several interviews. He testified that he was willing to take any job which allowed him to keep his house and "keep on going." (Tr., p. 154.)

During some of these interviews, Derstein recalls being asked questions regarding the basis for his termination from court services. Derstein responded to these questions by telling the truth, i.e., that he was fired because his employers believed he was sexually harassing female employees. Derstein anticipated that this question would come up in every interview he obtained, and when the question was asked, it made him very uncomfortable. (Tr., p. 156.)

In October, 1981, Derstein obtained employment as an assistant manager with Wendy's of Wichita. Derstein commuted to and from his job at Wendy's in Wichita to his home in El Dorado six days a week. Because of his hours and work schedule, Derstein was unable to continue teaching classes at Butler County Community College. Wendy's did not have family health insurance and it was thus necessary for Derstein to carry a separate Blue Cross and Blue Shield policy for his family.

Motivated by the prospect of obtaining family health insurance and better working hours, Derstein left Wendy's in October, 1982 to work as an assistant manager for the Hardee's outlet at the Towanda service area on the Kansas Turnpike. He again commuted to and from his home and job, a distance of approximately 25 miles, six days a week. In July, 1984 Derstein returned to work at Wendy's, where he was employed until January, 1985.

In January, 1985, Derstein was hired as a Corrections Officer I with the Kansas State Industrial Reformatory in Hutchinson. He was promoted to a Corrections Counselor I after approximately one month. In November, 1985, Derstein obtained the position he currently holds as a Correction Counselor II at the El Dorado Honor Camp.

On April 17, 1984, Derstein brought this action pursuant to 42 U.S.C. § 1983, claiming the circumstances of his termination from his position as a court services officer violated his right to due process. Specifically, plaintiff claims that he had a property interest in his continued employment, entitling him to a pretermination hearing, consisting of notice and an opportunity to respond to the charges against him; that the circumstances of his termination deprived him of his "good name and reputation," thereby implicating his liberty interest and entitling him to a "name-clearing hearing"; that he did not receive a pretermination or name-clearing hearing, resulting in a denial of his due process rights; and as a result of that denial and his unjustified termination, he suffered actual damages in excess of $250,000.00.

Plaintiff originally brought this action against the State of Kansas, Judges Benson, Brazil and Jaworsky, Steven Seyb, Marjorie Van Buren, and the three individuals who composed the administrative appeal board, Jess Danner, Kay Falley and

Herbert Walton.[4]

Early on, the plaintiff stipulated to the dismissal of all claims against the State of Kansas after agreeing that the state is immune from suit under the Eleventh Amendment. The court previously granted summary judgment in favor of defendants Danner, Falley and Walton on the ground these defendants were entitled to absolute judicial immunity. *See Derstein v. The State of Kansas, et al.*, No. 84–1219–K, slip op. at 18, 1988 WL 66183 (D.Kan. Apr. 28, 1988). Defendants Marjorie Van Buren and Steven Seyb were voluntarily dismissed by plaintiff at trial. Accordingly, the only defendants remaining at trial were Judges Benson, Brazil and Jaworsky.

Additional facts will be discussed where relevant.

## Conclusions of Law

■ The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed. 2d 548 (1972); *Sipes v. United States*, 744 F.2d 1418, 1420 (10th Cir.1984). Accordingly, before the court can reach the issue of whether Derstein was afforded due process, it must first consider whether, under the facts presented here, plaintiff had a protected property or liberty interest.

### A. *Property Interest*

■ A protected property interest in a particular benefit exists only if one has a legitimate claim of entitlement to it. *Board of Regents v. Roth*, 408 U.S. at 567, 92 S.Ct. at 2704. Property interests are not created by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Richardson v. City of Albuquerque*, 857

F.2d 727, 731 (10th Cir.1988). The sufficiency of such a claim of entitlement is determined by reference to state law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Hence, in this case, the court must determine whether plaintiff had a "legitimate claim of entitlement" to his employment under Kansas law.

While it is uncontroverted that Derstein did not have a written employment contract, Derstein contends he had an implied-in-fact employment contract. A property interest in employment can be created by such a contract. *Bishop v. Wood*, 426 U.S. at 344, 96 S.Ct. at 2077.

■ Kansas follows the general rule that in the absence of a contract between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party. *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 54–55, 551 P.2d 779 (1976); *Swart v. Huston*, 154 Kan. 182, 117 P.2d 576 (1941). An exception to the employment-at-will doctrine has been recognized, however, where the plaintiff can show the existence of an implied contract. *Morriss v. Coleman Co., Inc.*, 241 Kan. 501, 513–14, 738 P.2d 841 (1987).

In a memorandum and order dated April 28, 1988, in which the court took up defendants' summary judgment motions, the court thoroughly considered and analyzed Kansas case law leading up to the *Morriss* decision and concluded that the determination of whether an implied-in-fact employment contract exists involves a factual inquiry which must be determined from all of the evidence presented on that issue by the parties. *Derstein v. State of Kansas, et al.*, slip op. at 8. The court noted that the *Morriss* court, in ascertaining what factors should be considered in this inquiry, drew in part from an earlier Court of Appeals decision, *Allegri v. Providence–St. Margaret Health Center*, 9 Kan.App.2d 659, 664, 684 P.2d 1031 (1984), which stated:

---

**4.** This case was delayed for some time when defendants appealed the district court's ruling that Kansas' three year statute of limitation for actions arising out of contract applied to Der-stein's action. The Court of Appeals eventually affirmed the ruling. *Derstein v. Van Buren*, 828 F.2d 653 (10th Cir.1987).

It is well recognized that parties may become contractually obligated by their nonverbal conduct as well as by their use of oral or written words.... Although such an agreement cannot be established solely by an employee's subjective understanding or expectation as to his employment, a mutual intent to employ plaintiff as long as he did his job satisfactorily could be based upon such factors as the longevity of plaintiff's employment with defendant ... the nature of plaintiff's employment, ... and the excellent performance evaluations plaintiff received from defendant.

(Citations omitted.)

In its previous decision, the court also considered defendants' contention that they were entitled to qualified immunity because Kansas law recognizing the existence of implied contracts was not established until the Kansas Supreme Court's 1987 decision in *Morriss v. Coleman*, while Derstein's termination occurred in 1981. This court held:

This argument is without merit. As previously discussed, [*Johnson v. National Beef Packing Co.*] clearly recognized that implied employment contracts are an exception to at-will employment, and that the existence of such a contract depends upon the circumstances of the employment relationship. *Morriss* merely clarified that such a determination is not appropriate at the summary judgment stage if facts are present which evidence an implied contract.

*Derstein v. State of Kansas,* slip op. at 14.

Despite the court's previous ruling, defendants have renewed their contention that they are entitled to qualified immunity, and they now urge the court to adopt the approach recently taken by Chief Judge O'Connor of this district in *Staneart v. Board of Trustees of Ransom Memorial Hosp.,* 684 F.Supp. 1573 (D.Kan.1988).

In *Staneart,* plaintiff was terminated from her position as the director of nursing of a county-owned hospital. She then brought a § 1983 action against the hospital, asserting that she had a property interest by way of an implied contract of employment. Defendants moved to dismiss on the ground they were entitled to qualified immunity because the law in Kansas was not clearly established at the time of plaintiff's termination.

Judge O'Connor agreed, reasoning as follows:

In sum, the legal background against which Staneart's termination was made included a Kansas Supreme Court case [*Johnson v. National Beef Packing Co.*] which held that an employment manual distributed during an employee's tenure could not create an employment contract. It also included a Kansas Court of Appeals case [*Allegri v. Providence–St. Margaret Health Center*] which held that an employment manual, as well as positive performance evaluations, could be considered in determining whether an implied employment contract existed. A federal court had also interpreted Kansas law to recognize the relevance of an employment manual in determining whether an implied contract existed [*Rouse v. People's Natural Gas Co.,* 605 F.Supp. 230 (D.Kan.1985)].

Given this background, we find that the law in Kansas was not clearly established at the time of Staneart's termination as to the circumstances giving rise to an implied employment contract.

684 F.Supp. at 1577.

In reaching this decision, Judge O'Connor focused on the Kansas court's determination in *Johnson* that an employment manual distributed during an employee's tenure which contained a "just cause" provision did not create an implied contract of employment. Judge O'Connor did not refer, however, to the language in *Johnson* which clearly recognizes that an implied employment contract may be an exception to the employment-at-will rule, and that the existence of such a contract depends upon the factual circumstances of each particular case. The court held in *Johnson:*

"Where no definite term of employment is expressed, the duration of employment depends on the intention of the parties **as determined by circumstances in each particular case.** The under-

standing and intent of the parties is to be ascertained from the written or oral negotiations, the usages of business, the situation and object of the parties, the nature of the employment, and all the circumstances surrounding the transaction...."

*Johnson*, 220 Kan. at 54–55, 551 P.2d 779 (quoting 53 Am.Jur.2d, *Master and Servant* § 27, p. 103) (emphasis added).

This language was cited with approval by the Kansas Court of Appeals in *Allegri*, 9 Kan.App.2d at 663, 684 P.2d 1031, and by the Kansas Supreme Court in *Morriss*, 241 Kan. at 510, 738 P.2d 841. Accordingly, this court reaffirms its previous decision that at the time of defendant's termination, Kansas clearly recognized an implied contract as an exception to the general rule of employment-at-will.

Defendants argue, however, that even if the court holds that Kansas law recognized implied contracts in 1981, defendants are still entitled to qualified immunity because the question of whether an implied contract exists is a question of fact to be determined by the fact finder. Defendants reason that where the existence of a property interest depends upon the facts of a particular case, no property right can be "clearly established." Defendants again rely upon *Staneart v. Board of Trustees*, 684 F.Supp. at 1573, where Judge O'Connor held that even if clearly established, the law regarding implied contracts requires a determination by a fact finder that an employment contract exists. Judge O'Connor concluded that where a factual issue must be resolved to determine whether the plaintiff has a property interest in his continued employment, then the plaintiff does not have a "clearly established right to employment of which the defendants should reasonably have known." 684 F.Supp. at 1578. Accordingly, Judge O'Connor found the defendant in *Staneart* to be qualifiedly immune.

The court declines to adopt this analysis. Under the reasoning of *Staneart,* a plaintiff who claims to have an implied contract of employment could never establish the existence of a property interest in his or her continued employment since that question is one which must necessarily be resolved by a fact finder.

■ Pursuant to *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), public officials performing discretionary functions are shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Under this test, the defendants may be liable if a reasonable person would have known that Derstein had a property interest in his continued employment, and deprived him of that right without affording him due process.

■ The court has already determined that implied employment contracts were recognized in Kansas in 1981. Thus, a reasonable person would have been required to consider the circumstances of plaintiff's employment to determine whether an implied contract existed. While that determination would depend upon the factual circumstances of that case, the court cannot agree that the defendants can be absolved from liability for their decision simply because they were required to make some minimal evaluation of plaintiff's individual circumstance. Accordingly, the court concludes that the Kansas law recognizing implied employment contracts was clearly established in 1981, and defendants are not entitled to qualified immunity in this case.

■ The only question remaining is whether, under the facts presented at trial, Derstein established the existence of an implied employment contract and thus a property interest in his continued employment.

The court concludes that Derstein did have an implied contract of employment and his expectation of continuing employment pursuant to this implied contract gives him a property interest of which he cannot be deprived without due process. The facts supporting the court's finding include the existence of a personnel handbook which sets forth the terms and poli-

cies of employment, including that immediate discharge is allowed only for "grievous offenses;" plaintiff's tenured status according to the manual; the excellent evaluation he received less than a year before his termination; the fact that he was promoted to a supervisory position, albeit on a probationary basis, just two weeks prior to his termination; the longevity of his employment with the court system (9½ years); and the advanced education and degree he obtained in administration of justice while he was employed with the state.

Because Derstein had a protected property interest in his continued employment, the requirements of due process apply.

### B. *Liberty Interest*

Before the court considers whether or not Derstein was afforded due process in this case, it will first determine whether the circumstances of his termination implicated plaintiff's liberty interest.

The liberty concept recognizes two particular interests of a public employee: (1) a protection of his good name, reputation, honor and integrity; and (2) freedom to take advantage of other employment opportunities. *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988); *Miller v. City of Mission, Kan.*, 705 F.2d 368, 373 (10th Cir. 1983). The Tenth Circuit recently summarized the circumstances which implicate a public employee's liberty interest, entitling the employee to a hearing:

> When termination "is accompanied by **public dissemination** of the reasons for dismissal, and those reasons would **stigmatize the employee's reputation or foreclose future employment opportunities,** due process requires that the employee be provided a hearing at which he may test the validity of the proffered grounds for dismissal."

*Meder v. City of Oklahoma City*, 869 F.2d 553, 554 (10th Cir.1989) (quoting *Miller v. City of Mission, Kan.*, 705 F.2d at 373) (emphasis added).

There can be little doubt in this case that the reasons given for plaintiff's discharge, i.e., that he sexually harassed females in the office—were "stigmatizing." More-

over, this court held in its previous opinion that the "publication" element necessary to establish a liberty interest was satisfied by the plaintiff's "voluntary" revelation of the reasons for his termination to a potential employer. *Derstein v. State of Kansas, et al.*, No. 84–1219–K, slip op. at 11 (D.Kan. Apr. 23, 1988) (following *Polson v. Davis*, 635 F.Supp. 1130, 1142 (D.Kan.1986)).

Defendants now urge the court to reconsider its previous determination that plaintiff has alleged facts sufficient to support the "publication" or "public dissemination" element. The court agrees that reconsideration of this issue is in order.

In its previous opinion, the court overlooked the Tenth Circuit's decision in *Rich v. Secretary of the Army*, 735 F.2d 1220, 1227 (10th Cir.1984), wherein the court held that no liberty interest was implicated when the plaintiff himself publicized the circumstances of his discharge. The court specifically stated: "To impinge on a liberty interest, the stigmatizing information must be made public by the offending governmental entity." *Id. See also Downum v. City of Wichita, Kan.*, 675 F.Supp. 1566, 1572 (D.Kan.1986) (no liberty interest implicated where plaintiff, and not defendants, initiated the publication of information concerning plaintiff's transfer).

In light of this controlling authority, the court is required to hold that plaintiff's "voluntary" revelation of the reasons for his discharge to potential employers did not constitute the type of "publication" required to implicate plaintiff's liberty interest.

Since plaintiff failed to present any evidence at trial which would indicate that the defendants disseminated information regarding the reasons for plaintiff's discharge to the public, the court must find that under the circumstances of this case, plaintiff's discharge did not implicate a liberty interest.

### C. *Requirements of Due Process*

Although the court has found no implication of plaintiff's liberty interest, the existence of a property interest requires the

court to consider whether plaintiff was afforded due process in this case.

The type and degree of procedural protection necessary in order to comply with due process requirements is a question of federal constitutional law. The Supreme Court has held that the essential requirements of due process are notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Further, where protected interests are implicated, the right to "some kind of hearing" **prior** to dismissal is paramount. *Board of Regents v. Roth,* 408 U.S. at 569–70, 92 S.Ct. at 2705.

Thus, plaintiff was entitled to a hearing prior to his discharge. While this hearing need not have been elaborate, plaintiff was entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495.

The court has no hesitation in concluding that in this case Derstein received neither notice, nor an explanation of his employer's evidence, nor an opportunity to be heard prior to his discharge.

Derstein was not advised by the defendants that an investigation was being conducted or of the basis for the investigation. Nor was he told of Van Buren's conclusions or of the fact that she reported her conclusions to the judges. Rather, Derstein was simply advised on May 6, 1981 to appear in Judge Benson's chambers at 8:30 the following morning. Derstein had no idea what the subject of that meeting would be; in fact, he understandably believed that it was called in response to a request he had made for a meeting between himself, Seyb and Judge Benson.

Although the facts indicate that there had been personality conflicts and problems in the office for some period of time, there are no facts which would indicate that Derstein should have known that his termination was imminent. Approximately nine months before his discharge, Derstein received an overall evaluation of "excellent." While the evaluation indicated that Derstein was involved in "friction producing situations with female members of the staff," it did not indicate in any way that this friction related to sexual harassment, or that the failure to resolve the conflicts might lead to his termination. The evaluation further noted improvement in the areas of personnel motivation and communication with staff and advised Derstein to attend seminars on staff motivation and supervision. Moreover, just two weeks before his termination, Derstein had been placed in a supervisory position on a probationary basis, indicating the judges had at least some confidence in Derstein's ability.

At the meeting in which he was discharged, Derstein was advised that Marjorie Van Buren had completed an investigation, that the investigation revealed a "long-standing" problem of physical and verbal sexual harassment, and that Derstein had ten days in which to either resign or be terminated. Derstein was not given the opportunity to tell "his side of the story," nor could he have adequately responded if he had been given the opportunity, since he was never advised of the charges against him. Nevertheless, Derstein denied that he had ever sexually harassed any of his co-workers and asked those present what he had done. His questions were met with silence and he was advised only that he had acted "unprofessionally" and that he would have an opportunity to appeal the decision. Further, it is significant that Steve Seyb, Derstein's immediate supervisor, testified that the meeting in which Derstein was advised of his discharge did not constitute a "hearing," nor was it ever intended or planned to be a hearing.

The court cannot expand the concepts of "notice" and "opportunity to be heard" to encompass the circumstances of this case. Plaintiff did not receive anything even resembling a pretermination hearing, and thus the court concludes he was not afforded due process.

Defendants urge the court to find that even if plaintiff was not given a pre-

termination hearing, defendants cannot be held liable because the right to a pretermination hearing was not clearly established until the Supreme Court's 1985 decision in *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, and therefore defendants are qualifiedly immune. The court fully addressed this issue in its previous memorandum and noted that the right to a pretermination hearing was initially established by the Supreme Court in 1972 in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701. *Derstein v. State of Kansas,* slip op. at 15. In *Roth,* the Court held that "[w]hen protected interests are implicated, **the right to some kind of prior hearing** is paramount." 408 U.S. at 569–70, 92 S.Ct. at 2705 (emphasis added).

The court reaffirms its previous holding here and finds that the right to a hearing prior to the deprivation of a property interest was a clearly established right at the time of Derstein's termination in 1981. Accordingly, defendants are not entitled to qualified immunity for their actions in denying plaintiff due process.

■■■ Defendants next argue that plaintiff was not denied due process because he "waived" that right when he failed to properly perfect his appeal to the appeal panel. In support of this contention, defendants cite a number of cases wherein courts have held that if a plaintiff is "offered" adequate safeguards but "declines" to take advantage of them, the plaintiff has waived his due process rights. *See, e.g., Suckle v. Madison General Hospital,* 499 F.2d 1364, 1367 (7th Cir.1974); *Al–Charles, Inc. v. Heintz,* 620 F.Supp. 327, 331–32 (D.Conn. 1985).

The Tenth Circuit recently reiterated that a strong presumption is to be applied against the waiver of constitutional rights. *Pitts v. Board of Educ. of U.S.D. 305,* 869 F.2d 555, 557 (10th Cir.1989). Nevertheless, the court held that due process rights may be waived if the waiver is " 'done in an informed manner.' " *Id.* (quoting *Johnson v. United States Dept. of Agriculture,* 734 F.2d 774, 784 (11th Cir.1984)). In *Pitts,* a tenured teacher who had received notice of the board's decision to terminate him ini-

tially indicated his desire for a pretermination hearing as provided by statute. He subsequently filed a lawsuit, however, and indicated by letter his intent to waive his right to a pretermination hearing. In finding that Pitts had waived his right to due process, the court made clear that it was not holding that plaintiff was required to exhaust his claim before he had a federal cause of action; rather, the court reasoned that where state law afforded him adequate due process, plaintiff had no constitutional claim to begin with. *Id.*

This instant case is distinguishable from *Pitts* and from the cases cited by defendants in two important respects. First, plaintiff was never "offered" an adequate pretermination hearing. Second, plaintiff clearly did not "decline" or waive his right to a pretermination hearing. Nor did he decline to appeal the termination decision to the appeal board. Rather, he filed an appeal in which he intended to challenge the factual basis for his termination, but which the appeal board decided was frivolous because it only challenged the judges' finding regarding the classification of "sexual harassment" as a grievous offense.

Even if the court were to conclude that by failing to properly perfect his appeal, plaintiff "waived" his right to a hearing before the appeal board, plaintiff would not have waived his right to a "pretermination" hearing because the grievance procedures provided by the state constituted post-termination procedures.

In making this determination, the court is guided by the recent Tenth Circuit decision in *Seibert v. State of Okl., ex rel. University of Oklahoma Health Sciences Center,* 867 F.2d 591 (10th Cir.1989). In *Seibert,* a discharged university employee brought a civil rights action claiming, *inter alia,* that he was entitled to a pretermination hearing under the due process clause because he had a property interest in his continued employment. The district court directed a verdict in favor of defendants based on its finding that plaintiff, by refusing to initiate the grievance procedures outlined in the university's policy manuals, waived any right to a pretermination hear-

ing. The Tenth Circuit disagreed, holding that "the grievance rules effectively were post-termination procedures."[5] 867 F.2d at 596.

The "grievance rules" at issue in Seibert provided that a termination was not "final" until ten working days after the university gave the employee notice of termination. Further, the rules provided that an employee could begin grievance procedures any time during the 10–day period, and if the employee initiated grievance procedures, the termination was suspended temporarily. 867 F.2d at 597.

When compared to the facts in *Seibert,* the circumstances here provide an even clearer basis for holding that the procedures provided by the state were post-termination rather than pretermination procedures. Here, the personnel handbook provided for "appeal procedures" for an employee who is dissatisfied with a disciplinary action. The handbook stated that the appeal must be filed within ten calendar days after the action being appealed, but the filing of an appeal would not affect the operation of the action from which the appeal is taken. (Pl.Ex. 14.) Thus, although Derstein was told in the meeting with the judges that he had ten days in which to resign or be terminated, he had no right to appeal the termination decision until he received his letter of termination ten days later. Moreover, his subsequent appeal did not affect the operation of the termination decision.

Defendants argue that because plaintiff continued to work for ten days and was paid during that time period, his termination was not final and he had "opportunities to gain further explanation and give further responses at the pretermination level." (Defendants' Proposed Findings of Fact & Conclusions of Law, p. 45.) Neither the facts nor the handbook provisions support defendants' assertions.

On the same day of his termination, Derstein attempted in vain to discover the facts underlying his termination. He requested a copy of the investigation transcript from Judge Benson, who claimed that he did not have a copy of the transcript and referred Derstein to Steve Seyb. Seyb also claimed he did not have the transcript and suggested Derstein talk with Marjorie Van Buren. When Derstein phoned Van Buren in Topeka, Van Buren told him that Judge Benson did have a copy of the investigation transcript and that he could show it to Derstein. When Derstein again requested the transcript from Judge Benson, he was again advised that Benson did not have a copy.

Thus, it is clear that none of the parties involved had any intention of providing Derstein with a copy of the investigation transcript or an explanation of the charges for which he was terminated. Even if Derstein or his attorney had been successful in obtaining the transcript prior to his termination, it is clear that defendants did not intend to provide him a hearing prior to his termination, although they did expect him to take advantage of the post-termination appeal procedures.

The court concludes that the appeal procedures provided by the handbook constituted post-termination procedures and were not a substitute for the pretermination hearing to which plaintiff was entitled. Thus, Derstein's failure to properly perfect his appeal did not constitute a waiver of his due process rights. Since Derstein did not receive even minimal due process in the form of notice and an opportunity to be heard prior to his termination, the court concludes plaintiff was not afforded due process.

### D. *Damages*

In *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 4050, 55 L.Ed.2d 252 (1978), the Supreme Court held that procedural due process rules are "meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, lib-

---

**5.** Notwithstanding this conclusion, the Tenth Circuit affirmed the district court's holding after finding "more than sufficient evidence in the record to establish that the pre-termination pro-

cedures which the University accorded plaintiff fully satisfied plaintiff's constitutional right to notice and an opportunity to be heard before discharge." 867 F.2d at 598.

erty, or property." *See also Bell v. Little Axe Independent School Dist. No. 70*, 766 F.2d 1391, 1409 (10th Cir.1985). Hence, in *Carey*, the Court concluded that where an employee's discharge is "justified," but procedures are deficient in some respect, the employee can recover only those damages caused by the denial of procedural due process itself. In this case, Derstein asserts that he suffered mental and emotional distress as a result of the denial of due process, as well as consequential damages as a result of his "unjustified" termination.

Thus, in determining the measure of damages in this case, the court must first determine whether plaintiff suffered any damages as the result of the denial of due process itself. Next, the court must decide whether or not the plaintiff's termination was "justified"—i.e., whether plaintiff would have been terminated even if he had been afforded due process. If so, plaintiff is entitled to recover only for the denial of due process itself. If, on the other hand, plaintiff's termination was not "justified," he is entitled to recover the consequential damages he suffered as a result of his termination.

■ While the court has already concluded that plaintiff was not afforded procedural due process, damages are not presumed to occur from that denial. *Carey*, 435 U.S. at 262, 98 S.Ct. at 1051. Rather, plaintiff must have produced evidence that his mental and emotional distress actually was caused by the denial of procedural due process itself. *Carey v. Piphus*, 435 U.S. at 263, 98 S.Ct. at 1052. The court finds that plaintiff has met that burden.

■ Derstein testified as to the humiliation and distress he experienced as a result of the manner in which he was discharged. He related the difficulty and embarrassment he felt when he told his wife and others of the reasons given for his discharge, but was unable to relay any specific information because he had never been advised of the exact nature of the charges. Further, Derstein recounted the aggravation and frustration he experienced when he attempted to obtain a copy of the inves-

tigation transcript so that he might discover for himself the basis for his discharge, but instead he was referred from person to person and eventually denied the transcript.

Derstein's testimony clearly established the distress he suffered as the result of being denied the opportunity to tell his employers of 9½ years "his side of the story" or to obtain an explanation from them of the basis for their decision to terminate him. Accordingly, the court finds that plaintiff suffered damages in the amount of $10,000.00 as the result of denial of due process itself.

■ The court must next decide whether defendants presented sufficient evidence to prove by a preponderance of the evidence that plaintiff would have been discharged even if proper predeprivation procedures had been employed. *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1265 (7th Cir.1985); *Akbar v. Fairman*, 788 F.2d 1273, 1278 (7th Cir.1986). The defendants have the burden of proof on this issue. *Barberic v. City of Hawthorne*, 669 F.Supp. 985, 995 (C.D.Cal. 1987); *Alexander v. City of Menlo Park*, 787 F.2d 1371, 1375 (9th Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 879, 93 L.Ed.2d 833 (1987). The rationale behind placing the burden on the defendants to show that plaintiff's termination was justified is that it is the defendants' unlawful deprivation of due process which has made it difficult to determine what would have transpired if all parties had acted properly. *Id.*

■ Defendants have failed to meet their burden in this case. The evidence indicates that the initial decision to "investigate" Derstein's conduct was made not in response to complaints from individual employees, since no such complaints were ever made. Rather, the "investigation" was undertaken in response to a "rumor" that Sharon Neria intended to file a sexual harassment suit. Derstein was not advised of the investigation or of the results of the investigation. The judges each testified that they reviewed the investigative tran-

scripts of the conversations recorded by Van Buren, accepted Van Buren's conclusion that the defendant was guilty of "sexual harassment" and decided sexual harassment was a serious and grievous offense for which termination was immediately justified, without ever requesting or obtaining input from the defendant or anyone who might have suggested a different set of circumstances.

While plaintiff did not have the opportunity to dispute the allegations of "sexual harassment" prior to his termination, the allegations were substantially disputed by the plaintiff at trial. For instance, plaintiff denied that he ever tickled any of the females in the office, he denied ever "popping" their bra straps, and he claimed he never threw paper wads down anyone's blouse. Plaintiff admitted, however, that some two years prior to his termination, an attorney came into the office while plaintiff and other staff members were attempting to put together a new file cabinet. When the attorney asked what was going on, Derstein responded, "I'm screwing Sharon." Plaintiff recalled that a couple of days later Mary Wolfe advised him that Neria had been offended by his comment, so he apologized to Neria and told her he didn't mean anything by the remark. (Tr., p. 103.)

Judge Jaworski confirmed this version of the event in his testimony at trial. Jaworski stated that Derstein and Neria came to his office and Derstein explained what had happened and said that he had only been joking. Jaworski believed that Derstein was worried because Neria reacted negatively to the comment. In any event, Jaworski did nothing about the incident and did not hear it mentioned again until he read it in Van Buren's transcript of her interview with Sharon Neria. Jaworski does not recall whether he mentioned the incident to Van Buren, Seyb, or the other judges when he talked with them about the investigation. (Tr., pp. 617–19, 635.)

Plaintiff also admits to making the other isolated remarks attributed to him the transcripts, including a statement to Neil Harrison that Mary Wolfe "has a fine ass," and

a remark to Mary Wolfe to the effect that it wasn't cold outside, she was just "frigid." He also admitted that "a long time ago" Nancy Brush told him to stop touching her, but he felt that she was joking. Derstein disputes, however, that Neil Harrison ever advised him not to make sexist comments in the office. (Tr., pp. 227–229.)

The court finds Derstein's testimony to be credible and convincing. While the court does not condone the type of behavior admitted by Derstein, it is convinced that had Derstein been given the opportunity to present his side of the story, the judges would not have found Derstein's conduct to be a "serious and grievous" offense requiring immediate discharge. The court believes that Derstein would have been admonished or warned that his conduct was not acceptable and given an opportunity to correct his ways, and he may even have been removed from his supervisory position, but he would not have been terminated.

That Derstein's termination on the basis of "sexual harassment" was unjustified is further supported by the judges' letter in which they respond to Derstein's appeal. In the letter, the judges discuss in detail the "occurrences which culminated in the termination of Mr. Derstein." (Def.Ex. B.) These "occurrences," however, are not the statements made by Derstein's co-workers in the taped interviews. Rather, the judges discuss Mr. Derstein's "apparent lack of interest and failure to keep appointed office hours," his unwillingness to handle the cases of adult probationers, and his attempts to "assume the directorship of the local office." The letter further describes the "rumor" regarding an employee's plan to bring charges of sexual harassment, which prompted the investigation by Van Buren. The judges state that they relied upon the advice of Van Buren in deciding that Derstein's offense was of a "serious and grievous" nature, requiring immediate termination, but they do not discuss the details of Van Buren's investigation.

Derstein was advised in the May 6, 1981 meeting, and in the termination letter he received ten days later, that he was fired

for "sexual harassment." He was never advised that any of the "occurrences" alleged in the judges' letter were the basis of his termination. Moreover, the evidence indicates that he was never informed of or reprimanded for any of these alleged problems. The court finds this letter significant in that it indicates the uncertainty of the judges as to the basis for Derstein's termination. Moreover, even assuming that some of the reasons given in the letter for Derstein's termination were true, they would not have been considered "serious and grievous" offenses justifying immediate termination under the provisions of the handbook.

As stated, the court is convinced that had Derstein been afforded due process he would not have been discharged. Rather, it is likely that Derstein would have been removed from his supervisory position and reprimanded for his inappropriate actions toward female workers as well as for some of the other problems mentioned in the judges' response letter but never conveyed to Derstein. Accordingly, the court finds plaintiff is entitled to compensatory damages resulting from his wrongful termination.

 Derstein presented evidence as to the damages incurred as a result of his termination. These damages included lost past and future earnings, lost medical insurance benefits, lost college instruction income, and lost retirement benefits. In calculating plaintiff's lost and future income, however, plaintiff's expert, Nolan Luke, assumed that plaintiff would have followed a different career path had he not been terminated from his CSO–II position. (Pl.Ex. 43.) Specifically, plaintiff's damage calculations assume that plaintiff, rather than Mark Frey, would have been appointed to the Corrections Counselor II position at the El Dorado Honor Camp, which Derstein interviewed for in the fall of 1981. Plaintiff's expert further assumed plaintiff's career path would have resulted in his ultimately being appointed to the director position at the camp.

Defendants contend plaintiff's damage estimates are inaccurate because Robert Hannigan, appointing authority at the honor camp, testified that the decision not to hire Derstein as a Corrections Counselor II in 1981, as director of the camp in 1988, or for other positions he applied for during that time period, were not based upon Derstein's termination from court services for "sexual harassment." (Tr., pp. 708, 719.) For each position Derstein applied for, Hannigan explained the basis for his hiring decisions and the reasons why Derstein was not selected.

The court therefore finds that plaintiff's termination from court services played no role in Derstein's unsuccessful application for several positions at the honor camp, including the camp's director position in 1988. Accordingly, in arriving at its damage figure for lost income, the court has assumed that plaintiff would have remained in his employment as a Court Services Officer II. With this in mind, the court finds that Derstein has suffered damages as a result of lost income in the amount of $40,000.00. In this, the court has taken into account plaintiff's incidental damages, including lost medical insurance benefits, reduced retirement benefits, lost college instruction income, and travel expenses plaintiff incurred while working in Hutchinson.

 Finally, the court finds plaintiff is entitled to damages resulting from the mental and emotional distress he suffered as a consequence of his termination. There can be no question but that plaintiff's unjustified termination for "sexual harassment" left him humiliated and emotionally devastated. Plaintiff testified as to the humiliation and embarrassment he felt when he had to face family, colleagues and friends after his termination. Derstein had been active in community service groups, but after his termination he felt that in the eyes of the community he had suddenly and inexplicably lost his professional position, and he stopped participating in those groups. Derstein testified regarding the several months he spent searching for employment, the humiliation he suffered each time he was questioned in an interview regarding the basis for his termination

from court services, and of the frustration which finally led him to take a job with Wendy's, completely disrupting his career and altering his home life. The court therefore finds plaintiff suffered mental and emotional distress as a result of his unjustified termination and awards him damages of $40,000.00.

Finally, the court notes its recognition of the difficulty inherent in trying this case for all involved. No judge welcomes a case wherein the defendants are judges. Any case involving adjudication of a colleague is necessarily a difficult one. Nor has plaintiff's court-appointed counsel drawn satisfaction from the pursuit of this case. Notwithstanding, each of us have met our responsibilities and this case is now resolved.

IT IS ACCORDINGLY ORDERED this 22 day of May, 1989, that the court finds for plaintiff on his claim of denial of due process and awards him damages in the amount of $90,000.00, together with the costs of this action.

Plaintiff is at liberty to file an application for attorney fees.