867 F.2d 591
 51 Ed. Law Rep. 800, 4 Indiv.Empl.Rts.Cas. 459
 Milan C. SEIBERT, Plaintiff-Appellant,
v.
STATE OF OKLAHOMA, ex rel. the UNIVERSITY OF OKLAHOMA HEALTH
SCIENCES CENTER; Charles York, individually and in his
official capacity of Director of Site Support, Site Support
Div., HSC, State of Oklahoma; Toni Starin, individually and
in her official capacity as Assistant Director of Site
Support, Site Support Div., HSC, State of Oklahoma; Theo
Custer, individually and in his official capacity as
Mechanical Supervisor Site Support, Site Support Div., HSC,
State of Oklahoma; Bob Paris, individually and in his
official capacity as Plumbing Foreman, Site Support Div.,
HSC, State of Oklahoma; Bill Chenoweth, individually and in
his official capacity as Engineer, Site Support Div., HSC,
State of Oklahoma; Frank Rose, individually and in his
official capacity as Director of Office of Personnel
Services, HSC, State of Oklahoma; and Gary Smith,
individually and in his official capacity as Vice Provost
for Administration and Finance, HSC, State of Oklahoma,
Defendants-Appellees.
 No. 87-1376.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 10, 1989.
 
 James D. Jordan of Unruh & Jordan, P.C., Oklahoma City, Okl., for plaintiff-appellant.
 Susan Gail Seamans, Kurt F. Ockershauser, and Lawrence E. Naifeh of the University of Oklahoma, Norman, Okl., and Michael Mannes of Manners and Burke, Oklahoma City, Okl., for defendants-appellees.
 Before McKAY, SEYMOUR and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. Therefore, the cause is ordered submitted without oral argument.
 
 
 2
 The principal issues in this case are whether the University of Oklahoma Health Sciences Center provided plaintiff with satisfactory procedures before terminating his employment and whether the termination violated plaintiff's first amendment rights under the United States Constitution. We conclude that the University's pre-termination procedures were constitutionally adequate and that the termination did not violate plaintiff's first amendment rights. Accordingly, we affirm.
 
 
 3
 Plaintiff is a journeyman plumber certified to perform welding on high-pressure steam lines. He worked in the University's plumbing department for eleven years. About six months before his termination, plaintiff began voicing a series of complaints concerning the University's policies toward constructing and maintaining steam pipes and boilers. Many of plaintiff's complaints related to his views about the safety of those fixtures. Plaintiff repeatedly discussed his concerns with his superiors. On a few occasions, his superiors accepted his suggestions and made appropriate corrections. In the majority of instances, his superiors (many of whom were trained engineers) disagreed with plaintiff's views and told him so.
 
 
 4
 Plaintiff persisted in his complaints, raising the same concerns over and over. His relationship with his direct foreman deteriorated because plaintiff often refused to accept the decisions of the foreman and plaintiff's other superiors. Plaintiff's foreman had repeated discussions with plaintiff about the disruptive nature of plaintiff's complaints. On December 2, 1981, the foreman gave plaintiff an oral and written reprimand. As part of the reprimand, the foreman placed plaintiff on "probation" for six months and warned him he must accept the decisions of his superiors or face termination. (Dec. 2, 1981 letter, R. 82 Exh. 10; March 2, 1987 Tr. at 57-58.)
 
 
 5
 In the weeks following the reprimand, plaintiff's complaints continued. He complained to his state senator and the Oklahoma State Department of Labor. The state agency thereafter inspected the University's steam pipes and largely disagreed with plaintiff's concerns. He also expressed his views to other University workers, such as electricians, causing some of them to fear working in service tunnels near steam pipes.
 
 
 6
 The last straw occurred on February 24, 1982 when plaintiff contacted a supervisor in another department about his concerns. Without permission from his foreman, plaintiff left his job for an hour and fifteen minutes in order to take the other supervisor on an inspection tour of the items that plaintiff insisted were wrong with the University's steam pipes and boilers. Those were the same items that plaintiff had been raising and re-raising with his direct superiors for months.
 
 
 7
 When plaintiff returned from the unauthorized tour, his foreman summoned him to the foreman's office to explain his absence and to discuss the situation. At the meeting, plaintiff was less than candid. Plaintiff stated that the other supervisor requested that he "go look at something," failing to disclose that it was plaintiff who initiated the contact and the tour. On the next day, February 25, 1982, after consulting with other supervisory personnel, the foreman and another supervisor met with plaintiff and gave him the opportunity to resign. Plaintiff refused to resign, and the foreman fired him "[b]ecause of insubordination." (Paris Dep. at 42-43.)[1]
 
 
 8
 Under the University's policy manuals, the termination of an employee is not final for at least ten working days after the employee is notified of the termination. During those ten days, the employee has the right to initiate a series of grievance procedures. Here, although plaintiff consulted and retained an attorney during the ten-day period and gave the attorney a copy of the University's policy manuals within the period, plaintiff never invoked the procedures. At the end of the period, the University sent a letter to plaintiff stating that his termination was final.
 
 
 9
 Plaintiff then filed suit in the district court under 42 U.S.C. Secs. 1983, 1985, 1986, and 1988.[2] He also raised various pendent claims under state law. He named as defendants the State of Oklahoma, the University, and various University supervisors and officials involved in the dispute.
 
 
 10
 In a series of rulings, the district court (1) granted defendants judgment on the pleadings to the extent that plaintiff's complaint sought damages from the State, the University, or the individual defendants acting in their official capacities, holding that recovery of those damages was barred by the eleventh amendment to the United States Constitution (April 9, 1985 Order at 1-2); (2) awarded summary judgment to the defendants on plaintiff's first amendment claim and on his claim that he had been deprived of a liberty interest without due process of law (February 9, 1987 Order at 6); (3) directed a verdict in favor of defendants on plaintiff's claim that he was deprived of a property interest in continued employment without due process of law, holding that plaintiff waived his right to a pre-termination hearing (March 4, 1987 Judgment); and (4) dismissed plaintiff's pendent state-law claims (March 4, 1987 Judgment).
 
 
 11
 On appeal, plaintiff raises five issues: (1) whether the eleventh amendment barred plaintiff's damage claims against the State of Oklahoma, its entities, and its agents acting in their official capacities; (2) whether defendants violated plaintiff's first amendment rights; (3) whether plaintiff waived any right that he had to a pre-termination hearing by failing to invoke the University's grievance procedures; (4) whether the district court erred in dismissing the pendent state-law claims; and (5) whether the district court erred in failing to award summary judgment to plaintiff.
 
 I. Immunity Under Eleventh Amendment
 
 12
 Plaintiff asserts that his claims under 42 U.S.C. Secs. 1983, 1985, 1986, and 1988 against the State, the University, and the individual defendants acting in their official capacities are not barred by the eleventh amendment.[3] We disagree.
 
 
 13
 The Supreme Court expressly has held that the eleventh amendment prohibits damage suits against states under section 1983. Quern v. Jordan, 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979); Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). We see no reason why the Supreme Court's reasoning and holding should not apply with equal force to plaintiff's civil rights claims under section 1985 (conspiracy) and section 1986 (failure to prevent conspiracy violations). See, e.g., Williams v. Bennett, 689 F.2d 1370, 1376-77 (11th Cir.1982) (state board of corrections immune from damage suits brought under sections 1983, 1985, and 1986), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).[4]
 
 
 14
 Nor do we agree with plaintiff's contention that the University or its Board of Regents is separate from the State for eleventh amendment purposes. The relationship between a public entity and a state is determined by state law. Korgich v. Regents of New Mexico School of Mines, 582 F.2d 549, 551 (10th Cir.1978); Unified School Dist. No. 480 v. Epperson, 583 F.2d 1118, 1121 (10th Cir.1978). Under Oklahoma's constitutional and statutory scheme, the Board of Regents, which supervises the University and in whose name all suits against the University must be brought, is an arm of the State. Okla. Const. arts. XIII, XIII-A, XIII-B; Okla.Stat.Ann. tit. 70 Secs. 3201-3310 (1981). See Gay Activists Alliance v. Board of Regents, 638 P.2d 1116, 1123 (Okla.1981) ("For the purpose of monetary damages, as an administrative agency, in essence an arm of the State, the Board [of Regents of the University] enjoys the privilege of Eleventh Amendment ... immunity granted to the State").
 
 
 15
 It seems obvious that a judgment against the University or the individual defendants in their official capacities "must be paid from public funds in the state treasury," and hence "is barred by the Eleventh Amendment." Quern, 440 U.S. at 337, 99 S.Ct. at 1143. As we have stated previously, "a suit in a federal court against the members of a state board or agency acting in their official capacities is a suit against the board or agency itself, and [is] subject to the immunity afforded by the Eleventh Amendment." Unified School Dist. No. 480 v. Epperson, 583 F.2d 1118, 1121 (10th Cir.1978). See also, e.g., Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985) ("a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents"); McGhee v. Draper, 639 F.2d 639, 642 (10th Cir.1981) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"), quoting Monell v. Dept. of Social Services, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978).
 
 
 16
 Moreover, contrary to plaintiff's assertion, nothing indicates to us that Oklahoma has waived its eleventh amendment immunity. See Edelman, 415 U.S. at 673, 94 S.Ct. at 1360 (waiver of eleventh amendment immunity must be based upon " 'the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction' "), quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). Although plaintiff is correct that Oklahoma has waived its sovereign immunity in certain circumstances, that waiver does not, in and of itself, amount to a waiver of Oklahoma's eleventh amendment immunity. See Wallace v. State of Oklahoma, 721 F.2d 301, 305 (10th Cir.1983).
 
 
 17
 Consequently, the district court properly dismissed the damage actions against the State, the University, and the individual defendants acting in their official capacities. We must reach the remaining issues because plaintiff has requested injunctive relief as well as damages, and because plaintiff has sued the individual defendants in their individual capacities as well as their official capacities.
 
 II. First Amendment Issues
 
 18
 Plaintiff contends that "[c]learly ... his employment was terminated because of his speech." (Pl.Br. at 22.) That assertion is at least partially true, but it only begins the inquiry. Plaintiff's brief on appeal ignores the Supreme Court's two-part test for evaluating the first amendment rights of public employees: (1) whether the plaintiff's statements can be "fairly characterized as constituting speech on a matter of public concern"; and (2) whether the "interests of the [employee], as a citizen, in commenting upon matters of public concern" outweigh the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Meyers, 461 U.S. 138, 142, 146, 103 S.Ct. 1684, 1687, 1689, 75 L.Ed.2d 708 (1983). See also, e.g., Serna v. Manzano, 616 F.2d 1165, 1166-67 (10th Cir.1980) (requiring " 'balancing' between the right of a public employee to freely comment, believe and associate in matters of public interest and concern, and the competing interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees").
 
 
 19
 The district court assumed that the first part of the test was met: "Certainly, safety in the workplace is something which could rise to the level of public concern." (February 9, 1987 Order at 4.)
 
 
 20
 However, the district court concluded that plaintiff could not meet the second part of the test. We need not address the first part of the test because we agree with the district court's analysis of the second part (id. at 5-6):
 
 
 21
 Pickering [v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) ] requires full consideration of the government's interest in effective and efficient fulfillment of its responsibilities to the public. See Connick v. Myers, 461 U.S. 138, 150 [103 S.Ct. 1684, 1691, 75 L.Ed.2d 708] (1983). This includes the prerogative to remove employees when their conduct hinders efficient operation and interferes with mandatory close working relationships. Id. at 151 [103 S.Ct. at 1692]. See Arnett v. Kennedy, 416 U.S. 134, 168 [94 S.Ct. 1633, 1651, 40 L.Ed.2d 15] (1974). Furthermore, the employer is not required to let the situation reach a point where the work place is disrupted and the destruction of working relationships is manifest. Connick, [461 U.S. at 152, 103 S.Ct. at 1692]. Of course, these concerns must be appropriately offset by the nature of the employee's speech. Id.
 
 
 22
 This court has exhaustively examined the pleadings, interrogatories, depositions, and exhibits submitted by the parties in this case and has determined that the government's interest in maintaining a functioning work place outweighs plaintiff's expression about how jobs should have been done and what materials should have been used. Assuming plaintiff initially had a right to voice his opinions and concerns, it is undisputed that his supervisors looked into the complaints made to them and determined there were no safety problems. Paris [plaintiff's direct foreman] and two other supervisors, both engineers, spoke with plaintiff about his concerns. Unsatisfied with their explanation, he contacted the State Department of Labor who made an inspection of the HSC. The Department cited violations the HSC was obligated to correct. With one exception, however, these were not in the nature of plaintiff's complaints.
 
 
 23
 Nonetheless, even after this inspection, plaintiff continued to disagree about conditions and expressed this to other workers. His conduct created severe friction between himself and his foreman and caused disruption in other departments as well. In fact, his foreman received a number of complaints from supervisors that the workers in their departments thought their workplace was unsafe because of plaintiff's talk.
 
 
 24
 Our review of the extensive record convinces us that the University's interest in promoting the efficiency of its public services outweighed plaintiff's interest in repeating his disruptive safety complaints after the complaints had been investigated and settled. Accordingly, the district court correctly awarded summary judgment to defendants on this issue. See generally Osgood v. State Farm Mut. Auto Ins. Co., 848 F.2d 141, 143 (10th Cir.1988).
 
 III. Pre-termination Hearing Requirement
 
 25
 Plaintiff asserts that he was entitled to a pre-termination hearing under the due process clause because he had a property interest in continued employment by the University. In response, defendants contend that plaintiff had no property interest in continued employment and that even if he did, he waived his right to a pre-termination hearing. The district court decided to hold a bifurcated trial on those two issues in reverse order. The first portion of the trial was dedicated to the question of whether plaintiff waived any right that he might have had to a pre-termination hearing. If plaintiff were successful at the first portion of the trial, then the second portion was to concern whether plaintiff had a property interest entitling him to a pre-termination hearing.
 
 
 26
 At the conclusion of the first portion of the trial, the district court held that plaintiff, by refusing to initiate the grievance procedures outlined in the University's policy manuals, waived any right to a pre-termination hearing. Consequently, the district court directed the jury to enter a verdict in favor of defendants.[5]
 
 
 27
 We do not agree with the district court that plaintiff waived his right to a pre-termination hearing by refusing to initiate the University's grievance procedures because, in our opinion, the grievance rules effectively were post-termination procedures. However, we are persuaded that the judgment for defendants on plaintiff's due process claim should be sustained on the alternative ground that the undisputed evidence in the record establishes that plaintiff in fact was accorded all of the pre-termination hearing opportunities required by the Constitution. An appellate court may affirm the judgment of a district court on any grounds that find support in the record, provided the litigants have had a fair opportunity to develop the record. See, e.g., Blum v. Bacon, 457 U.S. 132, 137 n. 5, 102 S.Ct. 2355, 2359 n. 5, 72 L.Ed.2d 728 (1982) ("It is well accepted ... that without filing a cross-appeal or cross petition, an appellee may rely upon any matter appearing in the record in support of the judgment below"); Colorado Flying Academy, Inc. v. United States, 724 F.2d 871, 880 (10th Cir.1984), cert. denied, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986).
 
 
 28
 It is settled that the " 'root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.' " Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (emphasis in original), quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The Supreme Court in Loudermill held that "[t]his principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." 470 U.S. at 542, 105 S.Ct. at 1493. A pre-termination hearing is necessary in order to balance the competing interests at stake: the "private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." Id. at 542-43, 105 S.Ct. at 1493-94.
 
 
 29
 The Supreme Court in Loudermill held that a security guard employed by a school district should have been given some opportunity to explain an apparent misstatement found in his job application before being fired. The Court stated that the "pretermination 'hearing,' though necessary, need not be elaborate." Id. at 545, 105 S.Ct. at 1495. Indeed, "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." Id.
 
 
 30
 The purpose of the pre-termination hearing is to be an "initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46, 105 S.Ct. at 1495-96. In an employment context, the "essential requirements of due process ... are notice and an opportunity to respond.... To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546, 105 S.Ct. at 1495.
 
 
 31
 Here, the district court essentially held that the University's elaborate grievance procedures were pre-termination procedures which plaintiff knowingly waived. The district court apparently focused on the fact that under the University's procedures, a termination is not "final" until ten working days after the University gives the employee what the University calls a "notice of termination." The University's rules provide that the employee can begin the grievance procedures at any time during the ten-day period. The rules further provide that if the employee initiates the procedures, then the termination is suspended temporarily and "no termination papers will be processed ... until the grievance has been resolved." (Staff Handbook at 14 (R. 82 Exh. 9); March 2, 1987 Tr. at 44, 56.)
 
 
 32
 Although a termination technically is not final for ten days, in our view the University's policies demonstrate that as a practical matter, termination occurs as soon as the employee is given "notice of termination." During the ten-day period and during the pendency of the grievance procedure (assuming that the employee invokes the procedures), the employee is not allowed to work. (March 2, 1987 Tr. at 53.) More to the point, the employee receives no pay during that time. (Staff Handbook at 14 (R. 82 Exh. 9).) In addition, if the employee's grievance is not successful and the termination ultimately is upheld, then the effective date of the termination relates back to the date of the initial notice. (March 2, 1987 Tr. at 49.)
 
 
 33
 Indeed, the University's conduct in this case indicates that plaintiff's termination effectively occurred on the date of his final meeting with his supervisors and not ten days later. Although the University's witnesses testified that plaintiff's foreman gave plaintiff a "notice of termination" at their final meeting, the foreman's statement to the plaintiff at the time was more direct: "[A]s of now, you are terminated." (Id. at 38.)[6]
 
 
 34
 Therefore, we conclude that the University's grievance mechanism, at least in the context of the facts of this case, was effectively a post-termination procedure. Thus, contrary to the district court's reasoning, the fact that plaintiff knowingly waived his grievance rights is not relevant to the issue of whether plaintiff received proper pre-termination procedures.
 
 
 35
 Notwithstanding that conclusion, we find more than sufficient evidence in the record to establish that the pre-termination procedures which the University accorded plaintiff fully satisfied plaintiff's constitutional right to notice and an opportunity to be heard before discharge. The Constitution does not require an elaborate or formal pre-termination hearing. All that is required is an "initial check" against mistaken decisions. The employee needs only "notice and an opportunity to respond" to the basis of the firing. Loudermill, 470 U.S. at 545-46, 105 S.Ct. at 1495-96.
 
 
 36
 Here, there was an extensive history of warnings, including probation, whereby the University notified plaintiff that his conduct constituted insubordination and jeopardized his continued employment. The University gave plaintiff numerous opportunities, including face-to-face meetings, to justify and explain his position, but he continued to persist in his disruptive attitude and conduct. There is no dispute that plaintiff's supervisors ultimately fired plaintiff because, in their opinion, he was guilty of insubordination. (Paris Dep. at 42.) Plaintiff disagrees that he was, in fact, guilty of insubordination, given the alleged legitimacy of his safety concerns. But plaintiff does not dispute that he was warned that further conduct of the type which his supervisors deemed to be insubordination could lead to his discharge.
 
 
 37
 We conclude that plaintiff's supervisors gave plaintiff sufficient warnings and ample opportunities to "present his side of the story." Loudermill, 470 U.S. at 542, 105 S.Ct. at 1493.
 
 
 38
 First, plaintiff's foreman repeatedly told plaintiff that he was disrupting the department and that he could not keep rehashing his same complaints after his superiors had made final decisions. (E.g., Paris Dep. at 45-46.) During those discussions, plaintiff was given the opportunity to explain his position.
 
 
 39
 Second, in late 1981, another of plaintiff's supervisors met with plaintiff's wife, who also worked for the University. The supervisor told her about plaintiff's unacceptable behavior and sought her help in convincing plaintiff to cooperate with his supervisors. The supervisor told her that "if Mr. Seibert could not accept the opinion of two registered professional engineers he should not be working at the Health Sciences Center, especially if he had no facts to show the engineers were wrong." (Starin Interrogatories at 4, R. 82 Exh. 8; March 2, 1987 Tr. (first session) at 21-22.) On the next day, plaintiff's wife told the supervisor that she had talked with plaintiff and that he told her that he would see if he could "work things out" with his foreman. Plaintiff's wife also told the supervisor that, according to plaintiff, if the situation was not resolved, plaintiff "would not quit, but would have to be fired." (Starin Interrogatories at 5.)
 
 
 40
 Third, on December 2, 1981, less than three months before the termination, plaintiff's foreman held a formal meeting with plaintiff to discuss the problems created by his persistent complaints. The foreman gave plaintiff an oral reprimand, telling him that he was "on probation" for six months and that unless his disruptive actions ceased, he would be subject to termination. (March 2, 1987 Tr. at 21-22, 25-26.) Plaintiff again was given the opportunity to explain his position at that time.
 
 
 41
 Fourth, on the same day that he gave plaintiff the oral reprimand, plaintiff's foreman gave plaintiff a written reprimand conveying the same message. The written reprimand was entitled "Disciplinary Action" and stated that "[c]ontinuation of past attitudes, lack of communication or arguments when the job is assigned, will result in immediate termination." (Dec. 2, 1981 letter, R. 82 Exh. 10; March 2, 1987 Tr. at 57-58.) The written reprimand further stated that if plaintiff's conduct improved over the six-month probation period, then the reprimand would "be removed from [plaintiff's] personnel file and destroyed." Plaintiff signed a copy of the reprimand, indicating that he had "read the above."[7]
 
 
 42
 Fifth, on the day that the foreman discovered plaintiff's absence from work (when plaintiff was away conducting an inspection tour of his various concerns with a supervisor from another department), the foreman held another meeting with plaintiff. (March 2, 1987 Tr. at 22-23.) Plaintiff was given the opportunity to explain where he had been and why.
 
 
 43
 Sixth, on the next day, the foreman and another supervisor held what was to become the final meeting with plaintiff. Although the foreman testified that he did not "invite" plaintiff to explain his position again, the foreman purportedly had an "open mind" and "would have discussed it with him, but he didn't so choose." (Id. at 33.) After plaintiff rejected the foreman's suggestion that he resign, the foreman told him that he was terminated. The other supervisor present at the meeting then handed plaintiff a copy of the University's grievance procedures.
 
 
 44
 We believe that the totality of the procedures and opportunities which the University afforded plaintiff were sufficient to satisfy constitutional requirements. Plaintiff was not fired out of the blue. Plaintiff was not fired for reasons that he did not know. Plaintiff was not fired without being given the "opportunity to present his side of the story." Loudermill, 470 U.S. at 542, 105 S.Ct. at 1493. The University's procedures equaled or exceeded those sanctioned by the Supreme Court in Barry v. Barchi, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979). The Court in Barry held that no due process violation had occurred where a horse trainer whose license was suspended for allegedly drugging a horse "was given more than one opportunity to present his side of the story" before the suspension. Id. at 65, 99 S.Ct. at 2649.
 
 
 45
 Therefore, assuming for the sake of argument that plaintiff had a property interest in continued employment at the University, plaintiff had available all of the pre-termination due process protections that the Constitution requires.
 
 IV. Remaining Issues
 
 46
 Having concluded that the district court properly dismissed all of plaintiff's federal claims, we hold that the district court did not abuse its discretion in dismissing plaintiff's pendent state law claims as well. See, e.g., Key Financial Planning Corp. v. ITT Life Ins. Corp., 828 F.2d 635, 643-44 (10th Cir.1987); Dunton v. County of Suffolk, 729 F.2d 903, 910-11 (2d Cir.1984) (pendent state claims properly dismissed after trial began). Because the evidence was sufficient to support a judgment in favor of defendants, the district court properly denied plaintiff's competing motion for summary judgment.
 
 
 47
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 We conclude that the Paris deposition is properly part of the record in this case. Plaintiff and defendants both cited the Paris deposition in their summary judgment submissions. (E.g., R. 87 and 88.) Moreover, the district court stated in its February 9, 1987 Order that it had "exhaustively examined the pleadings, interrogatories, depositions, and exhibits submitted by the parties." (Order at 5, emphasis added.)
 
 
 [2]
 42 U.S.C. Sec. 1983 provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 Section 1985 of the same title prohibits conspiracies to interfere with civil rights. Section 1986 imposes liability upon persons who knowingly fail to prevent violations of section 1985. Section 1988 provides for the recovery of attorneys fees in certain civil rights cases.
 
 
 [3]
 The eleventh amendment provides:
 The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 The Supreme Court has interpreted the eleventh amendment to bar suits against a state by its own citizens as well as by citizens of another state. Hans v. Louisiana, 134 U.S. 1, 21, 10 S.Ct. 504, 509, 33 L.Ed. 842 (1890).
 
 
 [4]
 The eleventh amendment immunity established in Quern and Edelman does not necessarily apply to plaintiff's claim for attorneys fees under section 1988. See Hutto v. Finney, 437 U.S. 678, 693-95, 98 S.Ct. 2565, 2574-76, 57 L.Ed.2d 522 (1978) (attorneys fees properly awarded under section 1988 against state department of correction in civil rights suit seeking injunctive relief). However, for the reasons shown later in this opinion, the district court correctly entered judgment against plaintiff on his civil rights claims and, consequently, plaintiff was not entitled to attorneys fees under section 1988
 
 
 [5]
 Because of our disposition of this issue based upon the adequacy of the University's pre-termination procedures, we need not address whether plaintiff in fact had a property interest in continued employment deserving due process protection. Defendants point out that nothing in Oklahoma's statutes or in the University's policy manuals establishes that plaintiff was anything other than an employee terminable at will. Although defendants' arguments are facially compelling, the district court did not need to resolve the issue, and we need not do so either
 
 
 [6]
 The district court recognized the importance of whether plaintiff was terminated at the time of his final meeting with the foreman or ten working days later: "Well, sure it's ... terminology, but there's a vast difference between you're terminated or I'm going to recommend that you be terminated." (March 2, 1987 Tr. at 38.) The foreman's own interpretation of what happened was that he fired plaintiff at the time of the final meeting (id. at 30):
 Q. Okay. So you're saying, he was either going to quit or he was going to be fired right there; is that correct?
 A. Yes.
 
 
 [7]
 Plaintiff had the opportunity to challenge his probation and the reprimand by filing a grievance under the University's procedures. He did not do so