930 F.2d 32
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
Chris BALLMER, Plaintiff-Appellant,
v.
The BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY,
KANSAS, Tom Scott, Mark F. Schroeder, David Bayouth, Bernard
Hentzen, Billy Q. McCray, individually and as members of the
Board of County Commissioners of Sedgwick County, Kansas,
Defendants-Appellees.
 No. 89-3304.
 United States Court of Appeals, Tenth Circuit.
 April 2, 1991.
 
 Before SEYMOUR, BARRETT and STEPHEN H. ANDERSON, Circuit Judges.
 ORDER AND JUDGMENT*
 Barrett, Senior Circuit Judge.
 
 
 1
 Chris Ballmer ("Ballmer") appeals from an order of the district court granting summary judgment in favor of the Board of County Commissioners of Sedgwick County, Kansas, in their official and individual capacities ("defendants").
 
 
 2
 Ballmer was hired as Sedgwick County Appraiser in September, 1985. Also in 1985, the Kansas Legislature adopted legislation requiring statewide mass reappraisal. Ballmer's duties as county appraiser included supervising the reappraisal of property in Sedgwick County in accordance with the new legislation.
 
 
 3
 On June 17, 1987, at a board meeting, the defendants voted, inter alia, to relieve Ballmer of his supervisory role in the reappraisal effort. On July 15, 1987, again at a board meeting, the defendants asked Ballmer to resign; when he refused, the defendants fired him. An administrative hearing on Ballmer's termination began on June 27, 1989, but was continued. Ballmer subsequently withdrew from the post-termination administrative process.
 
 
 4
 Ballmer filed this action on July 27, 1987, alleging that the defendants had deprived him, without due process of law, of 1) his constitutionally protected property interest in his county appraiser position, and 2) his constitutionally protected liberty interest in his freedom to take advantage of future employment opportunities.
 
 
 5
 On May 5, 1988, the district court granted Ballmer's motion for partial summary judgment on Ballmer's deprivation of property claim. Thereafter, the defendants moved for summary judgment on Ballmer's liberty and property claims. As to the property claim, the defendants moved the district court to set aside its earlier order granting Ballmer partial summary judgment and instead grant them summary judgment by virtue of both a change of law and additional facts.
 
 
 6
 On October 13, 1989, the district court withdrew its May 5, 1988, order and granted the defendants' motion for summary judgment. The court determined that: 1) Ballmer's liberty interest claim was insufficient because he had failed to pursue to conclusion his post-termination administrative remedies; and 2) Ballmer's property interest claim was insufficient because he had received actual notice of his proposed termination and was provided with an adequate hearing.
 
 
 7
 On appeal, Ballmer argues that: 1) the district court's findings of fact are irrelevant and not supported by the record; 2) material questions of fact exist about whether he received constitutionally adequate notice of his firing; 3) he did not waive his liberty interest claim when he dismissed his post-termination administrative appeal; and 4) he did not receive a constitutionally sufficient pre-termination hearing.
 
 
 8
 In reviewing a grant of summary judgment, we must examine the record to determine whether any genuine issue of material fact remains, and, if not, whether the substantive law was correctly applied by the district court. Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319 (10th Cir.1987). Ruling on a motion for summary judgment involves purely legal determinations by the district court and our review is de novo. Missouri Pacific Railroad Co. v. Kansas Gas & Electric Co., 862 F.2d 796 (10th Cir.1988).
 
 
 9
 We have carefully reviewed the record in this case and hold that the district court did not make "findings of fact," as alleged by Ballmer, but instead relied on relevant undisputed facts in making its determination. We also hold that the court properly applied the relevant substantive law. Thus, we AFFIRM, substantially for the reasons set forth in the district court's Memorandum and Order of October 13, 1989, which is attached hereto.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF KANSAS
 
 10
 CHRIS BALLMER, Plaintiff,
 
 
 11
 vs.
 
 
 12
 THE BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY,
 
 
 13
 KANSAS; and TOM SCOTT, MARK F. SCHROEDER, DAVID BAYOUTH,
 
 
 14
 BERNARD HENTZEN, and BILLY Q. McCRAY, Individually and as
 
 
 15
 Members of the Board of County Commissioners of Sedgwick
 
 
 16
 County, Kansas, Defendants.
 
 No. 87-1414-K
 Oct. 13, 1989
 MEMORANDUM AND ORDER
 
 17
 PATRICK F. KELLY, District Judge.
 
 
 18
 The former county appraiser of Sedgwick County, Kansas, Chris Ballmer, brought the present action pursuant to 42 U.S.C. Sec. 1983, contending that the circumstances of his termination violated his due process rights under the Fourteenth Amendment. The plaintiff asserts both liberty interest and property interest deprivations. The defendants are the Board of Commissioners of Sedgwick County, and the individual commissioners.
 
 
 19
 On May 5, 1988, this court granted partial summary judgment to the plaintiff, finding that the circumstances surrounding his termination were a violation of due process. The defendants have now moved for summary judgment on both the liberty interest and property interest claims advanced by the plaintiff. Oral argument on the defendants' motion was held on October 2, 1989. For the reasons stated below, the court withdraws its order of May 5, 1989, and concludes that summary judgment must be granted on behalf of the defendants.
 
 
 20
 Plaintiff Ballmer was hired as Sedgwick County Appraiser on September 26, 1985. In 1986, Ballmer hired Torrey Baird as reappraisal coordinator of Sedgwick County. (Def. p 12.) Ballmer and Baird had previously worked together in New Mexico. (Pl.Ex. E, p 5.)
 
 
 21
 In 1985, the Kansas Legislature adopted legislation requiring statewide mass reappraisal. Under this reappraisal effort, the State Property Valuation Division (PVD) was given the responsibility to prescribe the timetables and guidelines for reappraisal. The individual county appraisers were given the responsibility of actually performing the reappraisal. (Def. p 6.)
 
 
 22
 On January 15, 1987, Ballmer submitted to PVD a revised reappraisal plan for Sedgwick County. The initial plan provided a projected budget of $3,610,000 for the reappraisal program in Sedgwick County. The revised plan increased the projected cost of reappraisal to $7,417,804. (Def. p 18.) Although the plan submitted by Ballmer to PVD stated that the increased budget "has been established for the reappraisal program in Sedgwick County," (Def.Ex. E, at 11), in fact, the revised plan had not been submitted to the board for its review or approval. (Def. p 18.) George Donatello, the reappraisal coordinator for PVD, has testified that while the agency had no formal requirement that revised plans receive the prior approval of the boards of commissioners for the various counties, the failure to do so would present a severe problem. (Def. p 19.)
 
 
 23
 On February 9, 1987, Ballmer and Baird met with several PVD officials, including Donatello, in Topeka. Donatello expressed concern that a great amount of money was being spent on reappraisal in Sedgwick County with little to show for it. PVD officers also expressed concern over the poor public relations between the Appraiser's Office and the Board of County Commissioners in Sedgwick County. When the PVD officials discussed the problems the PVD anticipated with reappraisal in Sedgwick County, Ballmer became defensive and threatened litigation. (Def. p 20, Ex. KK.)
 
 
 24
 On March 18, the board approved the budget increase for the 1987 reappraisal program. (Def.Exs. G, H.) On April 9, defendant Commissioner David Bayouth requested that Ballmer submit weekly written status reports on the reappraisal effort and monthly oral reports at regularly scheduled board meetings. (Def. p 23.) Also during April 1987, a meeting was held in defendant Commissioner Mark Schroeder's office to discuss public statements made by Baird concerning the PVD. At the meeting were Ballmer, Baird, Schroeder, County Counselor Robert Arnold, and Acting County Manager Gerard Harrison. It was agreed that Baird should not make any future public statements without clearing them through Ballmer first. (Def. p 24.)
 
 
 25
 On April 14, the PVD manager of systems and standards and the PVD field operations manager travelled to Wichita to investigate the progress of the Sedgwick County reappraisal program. The PVD officers met with Ballmer and Baird, as to expressed doubts about the methodology used in the Sedgwick County program. In a memo to PVD reappraisal coordinator Donatello, the PVD officials wrote that Ballmer "views our concerns as the typical Neanderthal reaction to an orientation we are incapable of comprehending." (Def.Ex. EE.)
 
 
 26
 On May 24, the Wichita Eagle-Beacon published an article on reappraisal in Sedgwick County written by staff writer Alissa Rubin. (Def.Ex. I.) The front-page article discussed the possible failure of the appraiser's office to meet the deadline for reappraisal, the controversy over Ballmer's management of the office, and the possible necessity of hiring a private consultant to assist in the reappraisal program. One unidentified county official is quoted as describing the appraiser's office as "a portrait of confusion ... a classic study of a department out of control." The article also contains responsive statements by Ballmer, who is quoted as stating that
 
 
 27
 I think we made the right choice in doing [the reappraisal] in-house. Possibly people are right, we didn't have quite the control we should, but it's a learning process and it's taken this long to get there. But now we're getting that control of the job and it's exciting, it's fun to do this.
 
 
 28
 The article also states that Ballmer "said that while the schedule is tight," he believed it could be accomplished by the December 31, 1988 deadline.
 
 
 29
 On June 8, Chief Commissioner Tom Scott, Counselor Arnold, and County Director of Economic Development Kim Dewey travelled to Topeka to meet with PVD officers. The PVD officers stated that Ballmer's management style would not produce a successful completion of the reappraisal project. They told the Sedgwick County officers that the PVD was prepared to petition the State Board of Tax Appeals to take over control of the reappraisal program in the county, unless the county make certain changes. In order to avoid a PVD takeover of the program, the county officers were told that, at a minimum, they would have to terminate Baird and hire an outside contractor to perform the commercial and industrial reappraisal. (Def. p 29.) The PVD recommended CAMA Technology, Inc. as an outside contractor.
 
 
 30
 On June 17, the board held a regularly scheduled meeting in which it unanimously approved a motion requiring Ballmer to terminate Baird. While all of the commissioners agreed it was necessary to terminate Baird, Commissioner Bayouth also expressed his belief that the situation required the removal of Ballmer as well. Bayouth stated during the meeting that
 
 
 31
 I just want to make one comment. After listening to all of you, I still feel, and I know that everything that I do in my store or my business, everything that goes wrong is my fault, you understand? I take that responsibility; and I feel that everything that is going on in the Appraiser's Office is Mr. Ballmer's responsibility, and it is his fault.... He has known about it. I've talked to him also in my office, and we discussed this same thing months and months and months ago, and he has made no changes. Even though he may feel he is right, obviously, we don't agree with him.
 
 
 32
 (Def.Ex. J, at 21.)
 
 
 33
 Ballmer was present at the meeting and given an opportunity to speak. He repeated his belief that "the reappraisal is on track and will be completed," but agreed to terminate Baird. (Id.) The board then approved a motion to deprive Ballmer "of any responsibility for the Sedgwick County reappraisal effort." (Id., at 22.)
 
 
 34
 On June 24, the board authorized CAMA Technology to conduct an evaluation of the reappraisal effort in Sedgwick County. (Def. p 32.) A working draft of the CAMA report was given to Director of Economic Development Dewey on July 9. On the same day, Dewey discussed the working draft of the report with Alissa Rubin of the Eagle-Beacon. (Def. paragraphs 33, 34.)
 
 
 35
 On July 10, the Eagle-Beacon ran a front-page article by Rubin entitled "Reappraisal Plan Called Ill-Conceived." (Def.Ex. II.) The article includes a statement of the unfavorable review of Ballmer's management of the appraiser's office contained in the CAMA report. Referring to the board's earlier approval of the consultation contract with CAMA, the article noted that
 
 
 36
 [a] majority of the commissioners said if the consultant's report indicated that problems in the program were due not only to its poor management by Baird, but also to poor planning by Ballmer, they would be prepared to fire him.
 
 
 37
 In addition, the article reported the statement of Commissioner Bayouth made on July 9 that "he expected there would be an executive session at [the July 15] commission meeting to discuss whether to fire Ballmer."
 
 
 38
 The article also quotes Ballmer stating that he did not believe there was "any problem with the plan the way we were working on it," and stating his belief that the outside consultation was unnecessary.
 
 
 39
 Prior to the July 15 board meeting, Ballmer hired an attorney to represent him. He also began to remove, copy, and then replace documents from the files of the County Appraiser's Office. (Def. p 11.)
 
 
 40
 At the July 15 hearing, the board formally received a copy of the CAMA report and heard an oral statement by Ed Hayes, the president of CAMA Technology. Hayes reported that the reappraisal project in Sedgwick County was behind schedule and over budget. Although only about 4% of the reappraisal work had been completed, approximately one quarter of the budget for the project had been expended. (Def.Ex. M, Minutes, p. 15.) Hayes concluded that the Sedgwick County reappraisal effort "will be a disaster; you won't finish, and what gets done will probably be of poor quality." (Minutes, p. 18.)
 
 
 41
 Following the completion of Hayes' statement, the commissioners questioned him for several minutes. Commission Chairman Tom Scott then asked Ballmer if he wished to respond. Ballmer stated that he had received the CAMA report earlier that morning and had not "had a chance to really study the report." However, he stated that "I have scanned it and listened to the report he delivered to you today [and] I do have problems with some of the things that have been said." (Def.Ex. M, Minutes, p. 27.) Ballmer then discussed the issues raised by Hayes involving the reappraisal effort's budget, the geo-processing and mapping system, the collection of land data, the development of new reappraisal plans, and the training of staff personnel. Ballmer's remarks occupy two and a half pages of the single-spaced, typewritten minutes of the hearing. (Def.Ex. M, at 27-29.)
 
 
 42
 At the conclusion of Ballmer's remarks, the board voted to recess into executive session, which Ballmer was asked to attend. (Def.Ex. M, at 30.) During the executive session, Ballmer was asked whether he would resign. When he refused, he was excused from the session. (Pl. Response, Ex. E, at p 7.)
 
 
 43
 Following the executive session, the board entertained a motion by Commissioner David Bayouth to terminate Ballmer. After the motion was seconded, Chairman Scott asked Ballmer whether he had anything to say before the board voted. (Def.Ex. M, at 31.) Ballmer responded that he did not. The defendants contend that during the executive session, Ballmer told the commissioners that his attorney had told him to request a hearing pursuant to K.S.A. 19-431 in the event he was terminated. (Def.Ex. O, p 3.) The plaintiff contends that this occurred in the open hearing rather than the executive session, but does not controvert the statement itself. (Pl.Ex. E, p 7.) The board unanimously accepted the motion to terminate Ballmer.
 
 
 44
 An administrative hearing on Ballmer's termination was commenced on June 27, 1989 before the PVD Acting Director. The hearing was adjourned without resolving the dispute, and the matter was indefinitely continued. Both parties blame the other for the delay in the hearing process. However, the record clearly indicates that the postponement of the hearing was the desire of both parties. The county requested an order of continuance due to the illness of Robert Arnold, the County Counselor. (Def.Ex. R, at 5.) Ballmer's attorney did not object to the requested continuance, but rather, joined in it, stating that the hearing should be delayed 90 days in order not to be "unduly ambitious." (Id. at 7.) Citing the difficulty in preparation for the hearing and the present litigation, Ballmer's attorney stated that he would have requested a continuance of the final hearing "independent of Mr. Arnold's health." (Id. at 8.)
 
 
 45
 On October 26, 1987, Ballmer's attorney wrote a letter to the PVD office in Topeka, stating:
 
 
 46
 Chris Ballmer does hereby dismiss his administrative appeal proceedings which are pending pursuant to K.S.A. 19-431. We intend to pursue the pending civil rights action.
 
 
 47
 (Def.Ex.S.)
 
 
 48
 A fact dispute exists between the parties over the nature of the methodology used by Ballmer in the county reappraisal program. The defendants generally contend that Ballmer utilized a "sequential" reappraisal scheme, which had little chance of timely achieving the goals of reappraisal. Ballmer contends that he never used a straight sequential plan, and that criticisms of the program remain invalid.
 
 
 49
 Summary judgment is proper, where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. McKenzie v. Mercy Hospital, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. Ellis v. El Paso Natural Gas Co., 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir.1987).
 
 
 50
 In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in Matsushita ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).
 
 A. Liberty Interest
 
 51
 Plaintiff Ballmer bases the present 42 U.S.C. Sec. 1983 action, in part, upon an alleged violation of his liberty interest. Ballmer contends that the defendants have injured his reputation through the communication of damaging and incorrect information.
 
 
 52
 The concept of liberty recognizes two particular interests of a public employee: (1) a protection of his good name, reputation, honor, and integrity; and (2) the freedom to take advantage of other employment opportunities. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.1988); Garcia v. Board of Educ. 777 F.2d 1403, 1418 (10th Cir.1985), cert. denied, 479 U.S. 814 (1986); Miller v. City of Mission, Kan., 705 F.2d 368, 373 (10th Cir.1983). When the termination of a public employee
 
 
 53
 is accompanied by public dissemination of the reasons for dismissal, and those reasons would stigmatize the employee's reputation or foreclose future employment opportunities, due process requires that the employee be provided with a hearing at which he may test the validity of the proffered grounds for dismissal.
 
 
 54
 Meder v. City of Oklahoma City, 869 F.2d 553, 554 (10th Cir.1989) (quoting Miller, 705 F.2d at 373).
 
 
 55
 The defendants present several arguments in favor of their motion for summary judgment on Ballmer's liberty interest claim. Two of these arguments share a common element. The defendants argue, first, that Ballmer does not present a valid liberty interest claim because he cannot demonstrate the falsity of the stigmatizing information reflected in the CAMA report, which the county adopted in terminating Ballmer. Second, they contend that Ballmer is entitled to nominal damages only, since Ballmer would have been terminated in any event. Both arguments depend upon the defendants' assertion that the CAMA report is truthful and accurate, and that Ballmer has failed to prove the opposite.
 
 
 56
 The defendants argue that Ballmer has not identified any expert witnesses who dispute the findings of the CAMA report, and that the only evidence offered on this point is the affidavit of Ballmer himself. The defendants argue that the affidavit of Ballmer is insufficient to raise a genuine fact issue as to the truth of the stated reasons for Ballmer's termination, and they condemn Ballmer's affidavit attacking the CAMA report as "mere conclusory allegations." (Def.Memo. at 17, 19.)
 
 
 57
 The defendants' argument must be rejected. The affidavit of Ballmer (Pl.Ex. E) is not conclusory, but offers a detailed rejection of the truthfulness of the stated grounds for his termination, including the truthfulness of the CAMA report. The affidavit and the attached answers to interrogatories assert specific facts which controvert the truthfulness of the reasons given for Ballmer's termination. The failure of Ballmer to cite other evidence on the issue in unimportant. Evidence offered by a party opposing a motion for summary judgment is deemed true and all reasonable inferences must be drawn in his favor. Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp., 805 F.2d 342, 346 (10th Cir.1986), cert. denied, 480 U.S. (1987).
 
 
 58
 However, while the factual arguments advanced by the defendants must be rejected, the court concludes that the liberty interest claim advanced by Ballmer is insufficient as a matter of law. Plaintiff Ballmer possessed an opportunity, which he did not exercise, to clear his name through the use of the hearing provided pursuant to K.S.A. 19-431. K.S.A. 19-431 provides suspended or terminated county appraisers with the right to request a hearing before the director of PVD. In the course of the hearing, the director is authorized under the statute to "make inquiry as to all facts connected with such suspension or termination."
 
 
 59
 While there is a strong presumption against the waiver of fundamental constitutional rights, nevertheless due process rights may be waived where the waiver is done in an informed manner. Pitts v. Board of Educ., 869 F.2d 555, 557 (10th Cir.1989). In the present case, K.S.A. 19-431 established a procedure under which the plaintiff could receive a hearing on his termination, and repudiate the charges against him. However, the plaintiff elected to pursue the matter solely through the present litigation, rather than through the completion of the procedures accorded to him under state law.
 
 
 60
 Plaintiff Ballmer makes two arguments in his brief on the present issue. First, he argues that a post-termination hearing cannot, as a matter of law, constitute a name-clearing hearing. The Tenth Circuit, however, has explicitly rejected such a rule. In Rankin v. Independent School Dist. No. I-3, 876 F.2d 838, 842 (10th Cir.1989), the court held that a name-clearing hearing may satisfy the requirements of due process, even though it occurs after the stigmatizing information has been published.
 
 
 61
 Ballmer's second argument must also be rejected. He contends that the K.S.A. 19-431 hearing could not have satisfied due process because of its delay. He argues that in October, 1987, when the matter would have been heard, new appraisal personnel had been appointed and new appraisal procedures instituted. A favorable determination at the hearing, he argues, would have been meaningless since it would have been impossible for him to return to work, readopt the procedures used during his previous tenure, and hope to accomplish the appraisal project within the established deadline.
 
 
 62
 However, the record clearly indicates that the delay in obtaining the hearing occurred not simply through the acquiescence, but through the active encouragement, of Ballmer. Ballmer made no objection to the county's July 27 request for a continuance, and indeed independently joined in the request, asking for a postponement of 90 days. Having given active support and encouragement to the delay of the K.S.A. 19-431 hearing, the plaintiff may not be heard now to argue that that delay deprived him of due process.
 
 
 63
 More importantly, Ballmer's argument simply misses the point. Ballmer argues that by October, 1987, substantial changes in the appraiser's office had occurred which made his reappointment to the position moot. He contends that by that date, his reappointment was impossible as a practical matter. But the present issue involves Ballmer's claim for damage to his liberty interest, not the deprivation of his property interest in the employment itself. It is the damage to Ballmer's name and reputation that are at issue in his liberty interest claim, and the K.S.A. 19-431 hearing could have addressed that question quite as well as the present litigation. Whether or not his reappointment as Sedgwick County Appraiser remained possible as a practical matter, the opportunity to clear his name remained. Ballmer's decision to ignore that opportunity is fatal to his liberty interest claim.
 
 
 64
 In oral argument, Ballmer argued that an exhaustion of administrative remedies should not be a requirement for a due process action. But this argument is to mistake the nature of the requirement. In rejecting a similar argument in Pitts, the Tenth Circuit noted that the point is not that the public employee "must exhaust his claim before he has a federal cause of action; rather, unless state law fails to afford [him] adequate process, he has no federal constitutional claim to begin with." 869 F.2d at 557. Thus in Pitts the court found that the plaintiff public school teacher, by waiving an administrative hearing, had deprived his employer school board of "the opportunity to provide him with due process, and [therefore] gave up his right to test the correctness of the board's decision." Id.
 
 B. Property Interest
 
 65
 Subsequent to its order filed on May 5, 1988, the court has had the opportunity to further address the due process rights of public employees in Dernstein v. Benson, 714 F.Supp. 481 (D.Kan.1989). In Dernstein, the court recognized that while due process does not require an elaborate hearing prior to the termination of a public employee, it does require that the employee be given "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 713 F.Supp. at 495 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985)).
 
 
 66
 In its May 5, 1988 memorandum order, the court found that Ballmer had a property interest in his continued employment as county appraiser. This finding remains valid, and is not challenged by the defendants in their present motion. However, the defendants seek a reconsideration of the court's conclusion that Ballmer had been deprived of due process to the damage of that property interest. After further review, and with the presentation of additional facts in the present motion, the court concludes that this earlier conclusion was not correct and must be withdrawn.
 
 
 67
 The conclusion in the May 25 order that the defendants had violated Ballmer's due process rights was based upon two considerations. First, the court found that Ballmer had not received adequate notice of the possibility of termination at the July 15, 1987 board hearing, or notice of the nature of the charges against him. The court noted that mere rumors or suspicious circumstances are insufficient to constitute actual notice. See, e.g., Okeson v. Tolley School Dist. No. 25, 760 F.2d 864 (8th Cir.1985), rev'd on other grounds, 766 F.2d 378 (8th Cir.1985).
 
 
 68
 However, it is now clear that plaintiff Ballmer did receive actual notice of his proposed termination at the July 15 Board meeting. The record indicates that prior to June, 1987, both PVD and county officials had expressed concern over the status of, and the methods used in, the Sedgwick County reappraisal effort. In the June 17 meeting which Ballmer attended, at least one of the defendant commissioners expressed his belief that Ballmer should be terminated, in addition to Baird, his immediate subordinate. During the course of the meeting, Baird was terminated and Ballmer was stripped of the authority to conduct the reappraisal effort in Sedgwick County. After the June meeting, a front-page newspaper article appeared which discussed the controversy over reappraisal in Sedgwick County and the possible termination of Ballmer at the next board meeting. In addition to a discussion of the possible termination of Ballmer, the article included a summary of the CAMA Report findings and statements by Ballmer rejecting the existence of "any problem" with the reappraisal effort.
 
 
 69
 Faced with this controversy, Ballmer undertook actions to protect his position. He hired and consulted with an attorney on the matter, a fact not brought out in the earlier motion for partial summary judgment by the plaintiff. Ballmer also began to remove and copy documents from the appraiser's office. His attorney made recommendations to Ballmer on what he should do in the event he was terminated at the July 15 meeting. Thus, Ballmer did possess actual notice of the likelihood of his termination at the July 15 meeting, and sought to prevent it.
 
 
 70
 In addition, while Ballmer was not presented with the detailed information contained in the final draft of the CAMA Report until immediately prior to the July 15 meeting, it is apparent that Ballmer had notice of the essence of the charges being made against him. The CAMA Report repeated, though in greater detail, earlier criticisms of the reappraisal program in Sedgwick County: the delays in the program, the "sequential" methodology used by Ballmer, the program's budget, the geo-processing and mapping system used in the program, the collection of land data, and the training of staff personnel. All of these were issues with which Ballmer, as Sedgwick County Appraiser, was intimately familiar and had defended in previous meetings with PVD officials. And all were addressed by Ballmer in his oral remarks to the commission members prior to the executive session at the July 15 hearing.
 
 
 71
 The finding of a due process deprivation in the court's May 5, 1988 order was also based upon the conclusion of the court that Ballmer did not receive an adequate opportunity to respond to the charges against him. In reaching this conclusion, the court recognized that while "Ballmer was entitled to something less than a full hearing prior to his termination, he was entitled to more that the simple question, 'Do you have anything to say before we take a vote?' " (Slip op.at 9.)
 
 
 72
 While this was the extent of the opportunity to speak accorded to Ballmer after the executive session, a review of the full course of the board meeting indicates that Ballmer was not deprived of the opportunity to present his side of the controversy. As noted earlier, prior to the adjournment to executive session, Ballmer orally responded to the issues raised in the CAMA Report and in Hayes' statements to the board. Ballmer's response was detailed and lengthy.
 
 
 73
 Here, plaintiff Ballmer was not terminated out of the blue, and was not terminated for reasons that he did not know. See Seibert v. Oklahoma, ex rel. Univ. of Okl. Health Sciences Center, 867 F.2d 591, 599 (10th Cir.1989). And he was given an opportunity to "present his side of the story." Loudermill, 470 U.S. at 542; Seibert, 867 F.2d at 599.
 
 
 74
 Therefore, the court concludes that summary judgment against the plaintiff's property interest claim is warranted. Because the court has also concluded that summary judgment must also be granted against the plaintiff's liberty interest claim, it is unnecessary to address the issues of good faith and qualified immunity raised in the defendants' motion.
 
 
 75
 IT IS ACCORDINGLY ORDERED this 13 day of October, 1989, that the order of the court of May 5, 1988 is withdrawn, and that the defendants' motion for summary judgment is hereby granted.
 
 
 
 *
 This Order and Judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3